NORTH CAROLINA LUMBER COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30673.  Promulgated December 31, 1952.

*Meade Whitaker, Esq.*, and *Lucien D. Gardner, Jr., Esq.*, for the petitioner.

*S. Earl Heilman, Esq.*, for the respondent.

591

## OPINION.

ARUNDELL, *Judge:* Section 600 of the Internal Revenue Code, as it was in effect prior to repeal by the Revenue Act of 1945, provided that corporations that were subject to capital stock tax for any year ending June 30 were also subject to a declared value excess-profits tax upon net income for the taxable year ending after June 30. The rate of tax was graduated and was imposed on the portion of net income that was in excess of specified percentages of the declared value of capital stock for the year ending the preceding June 30.[2] Section 602 defined net income for the purpose of that tax as the "same as the net income for income tax purposes" without deduction for the section 600 tax and with a dividends received credit. Section 501 (a) of the Revenue Act of 1943 amended the definition of net income by providing for the exclusion of the excess of net long term capital gain over the net short term capital loss. As this petitioner had no short term capital losses, we can speak of the "excess" as the capital gain. Section 510 (b) of the 1943 Act provided as follows:

TAXABLE YEARS TO WHICH APPLICABLE.—The amendment made by subsection (a) shall be applicable to taxable years beginning after December 31, 1943.

The petitioner contends that under a proper construction of the above provisions all capital gain realized by it in its fiscal year ended November 30, 1944, should be excluded from net income for purposes of the declared value excess-profits tax. Its contention brings into play other statutory provisions. One is section (c) of the Revenue Act of 1943 which provides that, unless otherwise provided, the terms used in that act shall have the same meaning as when used in the Internal Revenue Code. Section 48 (a) of the Code provided then, as now, that:

"Taxable year" means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the net income is computed * * *.

The argument runs that by reason of section 510 (b) of the 1943 Act, capital gains were excluded from net income for the calendar year 1944; the petitioner's taxable year was a year ending within the calendar year 1944; under section 48 (a) its fiscal year, ended in the calendar year 1944, was a taxable year beginning after December 31, 1943.

We cannot subscribe to the petitioner's views. As we read the statutory provisions, their words and their meanings are quite clear and we cannot substitute the words of either for those of the other. Section 48 (a) simply recites what a taxable year is. It may be a calendar year or a fiscal year *ending* within the calendar year. We read further

---

[2] An alternative tax was provided where income included war loss recoveries.

in section 48, subsection (b), that a fiscal year is a period of 12 months ending on the last day of any month other than December. In contrast with Code section 48, section 510 (b) of the 1943 Act speaks of taxable years *beginning* after December 31, 1943. The petitioner's taxable year was a fiscal year ending on November 30. Its first fiscal year *beginning* after December 31, 1943, was its fiscal year beginning December 1, 1944. The fiscal year before us had its beginning *before* December 31, 1943, to wit, on December 1, 1943. To hold otherwise would require a distortion of plain, easily understandable words, and we are not willing to sponsor an attempt to give them other meanings.

The first alternative contention of the petitioner is that its declared value excess-profits tax for the fiscal year ended November 30, 1944, should be determined by application of the proration formula contained in Code section 108 (b), which was added to the Code by section 108 of the Revenue Act of 1943. That section provides that in the case of a taxable year beginning in 1943 and ending in 1944, "the tax imposed by sections 11, 12, 13, 14, 15, and 450 shall be" an allocated portion measured by the number of days in the taxpayer's fiscal year which are within the calendar years 1943 and 1944, respectively.

Sections 11 and 12 deal with taxes on individuals and are not material here. Sections 13 and 15 impose, respectively, normal taxes and surtaxes on corporate income. Section 14, which was repealed by the Revenue Act of 1951, specified the rates of income tax on the income of special classes of corporations. Section 450, which was repealed by the Individual Income Tax Act of 1944, imposed the victory tax on income of indivduals.

The tax with which we are concerned was imposed by Code section 600 which is not mentioned in section 108 (b).

The respondent's position is that the proration formula provided in section 108 is to be applied only to those taxes that are imposed by the sections specified therein, and since section 600 is not specified, there cannot be any proration. The petitioner counters this by referring to Code section 603 which provided as follows:

*Other Laws Applicable.* All provisions of law (including penalties) applicable in respect of the taxes imposed by chapter 1, shall, insofar as not inconsistent with this subchapter, be applicable in respect of the tax imposed by section 600, except that the provisions of section 131 [3] of that chapter shall not be applicable.

We hold for the respondent on this point. The proration formula in section 108 (b) had its origin in section 140 of the Revenue Act of 1942 which added section 108 (a) to the Code. It provided for an allocation with respect to taxable years beginning in 1941 and ending

[3] Section 131 dealt with credits for taxes of foreign countries and possessions of the United States.

after June 30, 1942. By its terms it related to taxes imposed by sections 11, 12, 13, 14, and 15. Section 203 of the Revenue Act of 1942 added Code section 710 (a) which provided for an allocation of excess profits tax in the case of a taxable year beginning in 1941 and ending after June 30, 1942. The Senate Finance Committee, in its consideration of the provisions that became sections 140 and 203 of the Revenue Act of 1942 said in part:

This section [which became section 140] relates to the normal tax imposed by sections 11, 13, and 14 of the Code and to the surtax imposed by sections 12 and 15 of the Code, while section 203 relates to the excess profits tax imposed by subchapter E of Chapter 2 of the Code. [S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C. B. 587.]

The section as originally drafted by the Ways and Means Committee was amended by the Senate Finance Committee, the amendment being numbered 110. In the Conference Committee Report, the amendment was spoken of as follows:

This amendment relates only to normal tax and surtax, while amendment No. 260 relates to excess profits tax. [H. Rept. No. 2586, 77th Cong., 2d Sess., p. 43, 1942–2 C. B. 707.]

Nowhere, as far as we can find, is any reference made to the declared value excess-profits tax in section 108 or in any Committee reports in which that section was considered. Both in the enacted section and in the Committee reports, the provisions are carefully limited to income taxes and the excess profits tax. We have no legislative power, and we cannot add a section number to those that were listed by the Congress when it enacted section 108.

The petitioner relies on our holding in the case of *C. Ray Novak*, 11 T. C. 341. The taxpayers in that case reported income for the fiscal year November 1, 1943, to October 31, 1944. The adjusted gross income of each taxpayer was less than $5,000, and they claimed the right to compute their income taxes by use of the tax table provided in section 400, Supplement T, Chapter 1, of the Code, as amended by section 5 (a) of the Individual Income Tax Act of 1944. The respondent refused to allow the computation to be made under section 400 on the ground that no provision was made for determining the tax under that section when applying the provisions of section 108 (b) of the Code. We held for the taxpayers. We noted that at the same time that Congress amended section 108 (b) it also amended section 400 so as to provide that the taxes listed in the table should be "In lieu of the tax imposed by sections 11, 12, and 450 * * *." We thought that this was a sufficiently specific identification of the taxes that Congress had in mind, and that it intended that taxpayers could use the tax table in making computations under section 108 (b).

The *Novak* case is not authority for the position of the petitioner in these proceedings. We have pointed out above that section 108 (b)

contains no reference directly or indirectly to the declared value excess-profits tax.

The petitioner's argument as to section 603 is that it requires the application to the declared value excess-profits tax of all provisions of law applicable to Chapter 1 (income) taxes. While the language of section 603, quoted above, is broad, we find that precedent will not support the broad construction for which the petitioner contends. In the case of *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350 (Issue No. 2 at p. 1362), the respondent urged that Code section 729 (a) be applied to reduce the deduction for the amount of net abnormal income to which the taxpayer was otherwise entitled in computing its excess profits tax net income. Both section 729 (a) which was involved in that case and section 603 under consideration here provide that all provisions of law including penalties applicable in respect of Chapter 1 taxes shall, "insofar as not inconsistent with this subchapter, be applicable in respect of the tax" under immediate consideration, which in that case was the excess profits tax and here is the declared value excess-profits tax.

The arguments run parallel but with different ultimate consequences. In the *Arrow-Hart* case the respondent contended that the broad provisions of section 729 (a) required that a section in the income tax chapter (section 24 (a) (5)), relating to nondeductible expenses, be applied so as to result in an increase in the tax imposed by sections not within the income tax chapter. Here the petitioner insists that the broad provisions of section 603 require that a section in the income tax chapter (section 108 (b)), relating to proration, be applied so as to result in a decrease in the tax imposed by sections not within the income tax chapter.

In the *Arrow-Hart* case we considered the legislative history of section 729 (a) and also similar provisions contained in other tax statutes. We concluded that it was the intention of Congress in the enactment of that section to import into the excess profits tax sections only the administrative provisions of the income tax chapter and not substantive provisions which determine the amount of tax. We reach the same conclusion here as to the purpose of section 603 and hold that it does not permit the use of the proration formula of section 108 (b) in determining the amount of declared value excess-profits tax.

Finally, the petitioner contends that the respondent erred in determining that gain realized by it on the sale of assets, or at least that portion attributable to the contract with Plywoods-Plastics Corporation, was taxable in the fiscal year ended November 30, 1944.

The transactions upon which the petitioner reported a long term capital gain, and on which the respondent determined a deficiency, are described in several documents dated July 17, 1944. One of these

is a deed wherein the petitioner recites that it has "given, granted, bargained, sold and does hereby convey" to Shaw and Gooch 45,544 acres of land, more or less, the boundaries of which are described in detail. This deed also conveys to Shaw and Gooch several other tracts of land which, from their descriptions, appear to be relatively small in area. The deed contains the following provision:

The land aforesaid and the timbers thereon were sold, and this deed made subject to the following reservations and restriction:

(a) A timber lease and timber cutting contract from Grantor to Plywoods-Plastics Corporation, * * * giving and granting the right under conditions therein provided, to cut and remove for a period of fifteen (15) years certain timber on 5410 acres, more or less * * *.

Another instrument, also executed on July 17, 1944, was a bill of sale whereby the petitioner for a recited valuable consideration "grants, bargains, sells, conveys and delivers" to Shaw and Gooch, "their heirs and assigns" personal property described in detail and, according to the bill of sale, "most of which is located upon the plant site of" the petitioner. At or about the same time, Shaw and Gooch, joined by their wives, conveyed to H. A. Pharr, as trustee, the lands and personal property previously conveyed to them by the petitioner. The purpose of this conveyance in trust was to secure the payment of the $325,000 note given by Shaw and Gooch to the petitioner and also the $200,000 note given by Plywoods-Plastics Corporation to the petitioner.

The document which both parties regard as the most important of the group executed on July 17, 1944, is the one described therein as a "Timber Grant or Lease." That document, after the usual preliminary recitals of identification of the parties, provides:

(a) That the SELLER [the petitioner] has sold to the BUYER [Plywoods-Plastics Corporation], and the BUYER has bought from the SELLER, * * * all gum timber or trees [of specified diameter and grade] * * * being upon the following described tract of land: [here follows a description of the boundaries of the 5,410 acre tract].

(b) The title to the timber and trees above described shall remain in the SELLER and/or TRUSTEE as hereinafter stipulated, until all of the purchase price hereinafter stipulated shall have been fully paid, together with any interest that may accrue thereon, and until all of the covenants of this agreement have been fully performed; subject, however, to the BUYER's right to cut and remove timber from said land as hereinafter provided.

One of the points advanced by the petitioner is that under North Carolina law the agreement between it and Plywoods-Plastics Corporation was an agreement to transfer title in the future rather than a conveyance which operated as a present transfer. State laws and decisions are not uniform as to the effect of conveyances of standing timber. However, the courts of North Carolina have made it clear

that in that state such a conveyance, as a general rule, operates as a conveyance of realty in fee simple, defeasible as to the timber that is not cut and removed within the period specified. The general rule, supported by decisions of many cases, is stated in *Williams* v. *Parsons*, 167 N. C. 529, 83 S. E. 914, 915, as follows:

We have held in numerous cases that these deeds for standing timber, as ordinarily drawn, convey a fee-simple interest in such timber as realty, determinable as to all such timber as is not cut and removed within the time specified in the deed and that, while such estate exists, it is clothed with the same attributes and subject to the same laws of devolution and transfer as other interests in realty.

The petitioner recognizes that the general rule is as above stated, but seems to doubt its application in a situation as that before us where the agreement recites a reservation of title by the vendor. It cites the case of *Gatlin* v. *Serpell*, 136 N. C. 202, 48 S. E. 631, where the court held that under the contract before it, "The title to the timber did not at once pass to the [buyer] defendant." A reading of the opinion in that case shows that the contract there was radically different from the one before us. . There the contract recited that the owners "have contracted to sell and convey * * *." Here, the contract provision is that "the Seller has sold * * * and the Buyer has bought * * *." In the *Gatlin* case there was a down payment, but the court pointed out that that was simply a guarantee of ability and good faith on the part of the guarantee, and was not to be applied "as a present cash payment as the purchase money for the present title to the timber * * *." In this case there was a very substantial down payment, $200,000, which was made by the purchaser and used by the seller as a part of the purchase price of the standing timber. So we conclude that the cited *Gatlin* case is not authority for any holding in this case that the grant from the petitioner to Plywoods-Plastics did not convey present title.

The petitioner's argument on this point is founded on provision (b) of the grant wherein it is provided that title to the timber and trees should remain in the petitioner and/or trustee until all of the purchase price had been paid. In view of the unequivocal words of present conveyance in the first part of the grant, we think that the provision as to reservation of title is properly to be regarded only as being in the nature of a vendor's lien or mortgage to provide security for the balance of the purchase price. See *Helvering* v. *Lazarus & Co.*, 308 U. S. 252, affirming 32 B. T. A. 633. Moreover, it is to be noted that provision (b) of the grant makes the reservation of title subject to the buyer's right to cut and remove the timber.

But the question of the technical nature of the title acquired by Plywoods-Plastics Corporation is not necessarily decisive of the question presented here for decision. Clearly some interest in property

passed to Plywoods-Plastics Corporation and if that transaction resulted in gain to the petitioner it is subject to tax as provided by the Federal taxing statutes. *Burnet* v. *Harmel*, 287 U. S. 103.

The ultimate question for our decision is whether the events that occurred on July 17, 1944, and the instruments that were executed and delivered by the petitioner at that time marked completed and closed transactions. We think they did. It is clear from resolutions adopted by the petitioner's directors in June 1944, that it was intended that the petitioner should dispose of all of its properties, and then liquidate. It shaped events towards those ends. Wells negotiated for the sale of all of the corporate assets. It proceeded to execute the formal documents that were necessary to divest itself, by sales, of all of its properties. The instruments that were executed and delivered by the petitioner were not options, or contracts to sell, but were present grants of title. The purchasers went into possession, and one of them used its title as the basis for a loan from the Reconstruction Finance Corporation.

In *Commissioner* v. *Union Pacific Railroad Co.*, 86 F. 2d 637, affirming 32 B. T. A. 383, the owner of lands contracted to sell them, and the purchasers agreed to buy them for recited considerations payable in installments over a period of years. The purchasers took possession in the years in which the contracts were executed, paid the purchase price installments, and received deeds in the years when the final installments were paid. It was held that there had been closed transactions in the years in which the sales contracts were entered into and the purchasers took possession, rather than in the later years when deeds were delivered. The Circuit Court said in part:

A closed transaction for tax purposes results from a contract of sale which is absolute and unconditional on the part of the seller to deliver to the buyer a deed upon payment of the consideration and by which the purchaser secures immediate possession and exercises all the rights of ownership. The delivery of a deed may be postponed and payment of part of the purchase price may be deferred by installment payments; but for taxing purposes it is enough if the vendor obtains under the contract the unqualified right to recover the consideration. *Commissioner* v. *North Jersey Title Ins. Co.*, 79 F. (2d) 492 (C. C. A. 3); *Helvering* v. *Nibley-Mimnaugh Lumber Co.*, 63 App. D. C. 181, 70 F. (2d) 843; *Commissioner* v. *Moir*, 45 F. (2d) 356 (C. C. A. 7).

In the instant case there was a contractual obligation to pay even though no notes or other evidence of debt were given. It was not an executory contract, as where the transfer of title and full payment are made conditions to the completion of the transaction. *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11, 50 S. Ct. 184, 74 L. Ed. 668. The respondent granted a period of payment and retained title for his own protection. The obligations imposed upon the purchaser of the Seattle Tide Lands, such as preserving and insuring the property, were intended to fulfill the same purpose of security.

The petitioner did more in these proceedings to mark a closed transaction in 1944 than did the taxpayer in the *Union Pacific* case in

the year in which it was held that the transaction was closed and completed. Here, the petitioner in 1944 executed and delivered a deed and bill of sale to Shaw and Gooch, and a timber grant to Plywoods-Plastics Corporation. Under the provisions of those instruments, the petitioner had an unqualified right to receive the sales price agreed upon for the properties. Under the accrual method of accounting, it is the right to receive and not the actual receipt that determines the inclusion of an amount in gross income. "When the right to receive an amount becomes fixed, the right accrues." *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182; *Frost Lumber Industries, Inc.* v. *Commissioner*, 128 F. 2d 693.

The petitioner places emphasis on the fact of its oral agreement with Shaw that Plywoods-Plastics Corporation was not to cut the timber on the 5,410-acre tract, and that the rights to that timber were to be transferred to the Shaw-Gooch partnership. This we regard as merely an additional form of security demanded by the petitioner for the payment of the purchase price of the properties. This agreement did not affect the titles conveyed by the instruments of July 17, 1944, nor the petitioner's right to receive the price agreed upon for the properties.

The respondent did not err in treating the gain on the sale of the petitioner's properties as income for the fiscal year ended November 30, 1944, and subject to declared value excess-profits tax.

*Decision will be entered under Rule 50.*

