## 2 LEXINGTON AVENUE CORP., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53499.   Filed July 13, 1956.

*Herbert J. A. Runsdorf, Esq.*, for the petitioner.
*Clarence P. Brazill, Esq.*, for the respondent.

818

**OPINION.**

KERN, *Judge:* The sole issue for decision herein is whether petitioner is taxable on the net income of the Hotel Gramercy Park, as adjusted by conversion to the accrual basis, for the period May 1, 1949, through June 14, 1949.

The petitioner's position is that the income for this period is that of Insurance Company, the vendor, which retained the risk of loss, possession of the premises, and possession of the receipts until the closing on June 15, 1949. Respondent, on the other hand, contends that such income is taxable to the petitioner on the ground that under the contract of sale the benefits and burdens of the ownership of the property passed to the petitioner as of May 1, 1949, and that the income received thereafter was, in reality, the income of petitioner

which derived economic benefit and satisfaction therefrom by the application of the net amount to the balance of the purchase price due on the closing. Respondent bases his argument on the proposition that the refinements of the passage of title do not govern the taxation of sales of property and that a closed transaction for Federal income tax consequences is deemed to occur regardless of the time title passes, when the benefits and burdens of ownership from a practical standpoint have previously been transferred to the buyer, citing *Commissioner* v. *Union Pacific Railroad Co.*, (C. A. 2, 1936) 86 F. 2d 637, affirming 32 B. T. A. 383; and *North Carolina Lumber Co.*, 19 T. C. 587, reversed on other grounds (C. A. 4, 1954) 211 F. 2d 543.

We are unable to accept respondent's position and agree with the petitioner that the income from the hotel during the period in question was earned by and taxable as such to the vendor and not to the purchaser. The fact that respondent may have allowed the statute of limitations to run with respect to Insurance Company or that the tax is otherwise not collectible from the vendor does not justify a shift of the tax on this income to the petitioner. See *Pratt-Mallory Co.* v *United States*, (Ct. Cl., 1936) 12 F. Supp. 1020.

The *Union Pacific* and *North Carolina Lumber* cases, cited by respondent in support of his basic premise, are clearly distinguishable from the instant case. The first involves the time of taxation of the gain realized upon the sale of property on the basis of installment payments, where the deed is delivered upon the completion of the payments. The purchaser therein took immediate possession, assumed the expenses of management, and applied the rentals received to the purchase price, whereas in the instant case exclusive possession was retained by Insurance Company. The vendor in that case had the unqualified right under the contract to recover the consideration whereas in the instant case the inability of Insurance Company to deliver a marketable title on the closing date would have released the petitioner from its obligations under the agreement and would have entitled it to a refund of its downpayment. This distinction was specifically noted by the Court of Appeals for the Second Circuit where at page 639 of its opinion it stated:

In the instant case there was a contractual obligation to pay even though no notes or other evidence of debt were given. It was not an executory contract, as where the transfer of title and full payment are made conditions to the completion of the transaction. Lucas v. North Texas Lumber Co., 281 U. S. 11, 50 S. Ct. 184, 74 L. Ed. 668. The respondent granted a period of payment and retained title for his own protection. The obligation imposed upon the purchaser of the Seattle Tide Lands, such as preserving and insuring the property, were intended to fulfill the same purpose of security.

This Court in its opinion in the same case in 32 B. T. A. 383, at pages 391 and 392, similarly had pointed out that while the purchaser's right

to and possession of the property prior to the transfer of the title might be qualified, there was no qualification of the vendor's right to the price and that it made little difference to a seller on the accrual basis whether a deed was delivered in escrow or withheld by the vendor as security for the purchaser's full performance.

In the *North Carolina Lumber* case, *supra*, which relied upon the *Union Pacific* case, the documents in question were held to amount to a present conveyance of title subject to a vendor's lien rather than a contract to sell and the taxpayer-seller had the unqualified right to receive the agreed sales price.

Respondent has also cited us to *Moore* v. *Commissioner*, (C. A. 7, 1941) 124 F. 2d 991, as an example of the taxation of income to the beneficial owner of property. Therein, pursuant to a contract the seller of certain stock had endorsed the stock certificates in blank and deposited them with an escrow agent who affixed the certificates to notes of the buyer. The contract also provided that dividends were to be credited upon the principal and interest of the notes, and when a note was paid up the certificates attached to it were to be released to the buyer. If the buyer defaulted on the payment of the principal and interest of a note, it was to be returned to him and the attached stock certificate returned to the seller. The buyer was thus not personally liable for payment of the notes which represented the balance of the purchase price, the buyer having previously made a very substantial downpayment. The Court of Appeals for the Seventh Circuit held that title to the stock had passed to the buyer and out of the control of the seller who had nothing further to do in a transaction tantamount to a conditional sale and, alternatively, that even if title remained in the seller, it was only for the purpose of securing payment, the beneficial ownership of the stock having passed to the buyer. Thus, the purchaser rather than the seller, who was the taxpayer in the case, was chargeable with the income tax on dividends received during the period the certificates were held in escrow.

In *De Guire* v. *Higgins*, (C. A. 2, 1947) 159 F. 2d 921, which involved the income tax liability of the purchaser in the same transaction, a similar result was reached on the ground that while the ultimate ownership of the income, as between the buyer and the seller, was temporarily suspended by the escrow arrangement, when the buyer picked up his option and paid off the notes, the stock certificates attached thereto and the dividend income related to such certificates were released from their uncertain ownership status and became the income of the buyer. Judge Clark, in a concurring opinion, agreed with the result on the basis of the opinion in the *Moore* case which he took to involve a comparative weighing of the respective

bundles of rights or attributes of ownership, such as beneficial rights, powers, and privileges, held by the buyer and seller.

Even if cases involving the taxation of income during the period when corporate stock certificates are held in escrow pending payment are pertinent to the consideration of a case involving the taxation of the income earned by actively managed real property, we are of the opinion that the *Moore* and *De Guire* cases are sufficiently distinguished by pointing out that in the instant case Insurance Company not only did not convey title to the petitioner until June 15, 1949, but did not convey title in escrow prior to that date; that until June 15, 1949, it was the vendor's responsibility to operate the property and on the closing date to offer a marketable title to the purchaser and to execute the deed and bill of sale. The contract in the instant case was executory on the part of the vendor when the income was earned and the vendor's retention of title during the period of May 1 through June 14 was not for the sole purpose of securing payment of the agreed price but undoubtedly was also for the purpose of affording a reasonable time to the purchaser to search the title and to arrange financing.

In our opinion, the vendor retained and did not transfer, even conditionally, the important attributes of ownership with regard to the property during the interim period in question together with the corresponding burdens of ownership. Under the terms of the contract, the vendor retained title and exclusive possession until the delivery of the deed, and also retained for the same period the risk of loss or damage to the premises by fire. Under the Uniform Vendor and Purchaser Risk Act, in effect in New York in 1949, the vendor bore the risk of loss if all or a material part of the property were destroyed in any manner, whether or not by fire, without the fault of the petitioner, or if the property were taken by eminent domain. In such event, the Insurance Company would have been unable to enforce the contract and would have been required to return the downpayment. N. Y. Real Property Law, sec. 240–a (1) (a). Although the contract provided for the allocation to the petitioner, as of May 1, 1949, of what appear to be the normal operating expenses of a hotel so that the petitioner was to be responsible for such costs if the transaction were completed and was to receive the rental income for the same period, no provision of the contract made the petitioner liable for any net operating loss. It was obviously the intention of the parties that the costs would be paid out of gross income.

Regardless of the manner in which Insurance Company and the petitioner may have respectively treated the proceeds of the sale and the payment of the purchase price on their books of account, in view of the substantial risks and burdens of ownership retained by the vendor and the conditional status of both the conveyance of the title and the

benefits of the property between May 13 and June 15, 1949, we read the agreement as a contract to sell and to purchase the physical assets of the hotel, as specified, together with the net income, if any, earned by the property between May 1, 1949, and June 15, 1949, for the flat sum of $1,350,000, subject to the adjustments customary upon the sale of real property. Respondent's argument to the contrary would require the taxation to the petitioner of income to which it might never have been entitled as the earnings from property to which it might never have acquired title. Under the circumstances present in this case we cannot hold, as respondent urges, that the right to receive the income during this interim period had become fixed and hence accruable by the petitioner. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182.

It is clear from the contract that during the period in question it was the vendor and not the purchaser who was obligated to render the service that was to earn the income to be derived by the property. See *Hyde Park Realty Inc.* v. *Commissioner*, (C. A. 2, 1954) 211 F. 2d 462, affirming 20 T. C. 43; *J. Ungar, Inc.*, 26 T. C. 331 (1956). The operation of the hotel and the rendition of this service were to be under the management of Schwefel as an independent contractor under an agreement with the vendor. This agreement charged him with a duty to use his best efforts to operate the hotel efficiently for the vendor and, regardless of the conveyance of title, his compensation depended in part upon the gross revenue. The notice of termination of his engagement given to Schwefel in the May 13 contract with Insurance Company was effective only upon the delivery of the deed, and he remained responsible to the vendor for the performance of his duties.

Thus, the income in question was earned at a time when the greater bundle of rights or attributes of ownership, including title, possession, management, and the substantial burdens and possibly the benefits of the ownership of the property, were all still possessed by Insurance Company, and hence Insurance Company and not the petitioner was liable for the tax thereon. *Helvering* v. *Horst*, 311 U. S. 112; see also *Cold Metal Process Co.*, 25 T. C. 1333 (1956); *Clarence W. Miller*, 26 T. C. 151 (1956). We are unable to comprehend respondent's contention that "it is not inconceivable that under the accrual method both buyer and seller had a right to receive this income which became fixed at different times and such income, under that method, would be reportable by each." The income for the period in question belonged either to Insurance Company or to the petitioner, not to both. *De Guire* v. *Higgins, supra*.

We are aware that the petitioner ultimately benefited from the application of the net income between May 1, 1949, and June 15, 1949, to the purchase price. However, the disposition of income already

earned by Insurance Company would not save it from taxation, nor could the transfer of such income to the petitioner result in the imposition of the tax on the latter. *Hulbert* v. *Commissioner*, (C. A. 7, 1955) 227 F. 2d 399, affirming a Memorandum Opinion of this Court filed December 30, 1953. In this case, the authority nearest in point to the instant case, a partnership entered into a contract on March 26, 1946, for the sale of its business. The sale was made upon the basis of the January 26, 1946, balance sheet of the partnership, and the contract further provided that the vendor partnership would operate the business for the benefit of the buyer from January 26, 1946, to the date of the consummation of the agreement which was fixed by the contract as on or before June 26, 1946, which period was designated as the Buyer's Business Period. It was also provided that one-half of the net profits of the business from January 26, 1946, to the date of consummation, after the deduction of taxes, would belong to the buyer. The other half of the net profits would constitute a part of the purchase price, and would be paid by the buyer to the partnership. The agreement also recited the buyer's intention to finance the purchase through a stock issue contingent upon qualification under Securities and Exchange Commission rules and the Blue Sky laws of the various States. If such financing were not effected in 90 days, the partnership was to retain $7,500 downpayment as liquidated damages. Various provisions of the agreement referred to the business as that of the sellers. If the sale was not consummated, the buyer was not to be responsible for any losses, and the partnership was to retain any profits during the period January 26, 1946, to June 26, 1946. Although the stock issue was not approved by the Securities and Exchange Commission, the sale was consummated on June 26, 1946, and the Court of Appeals for the Seventh Circuit held that the vendors were liable for the tax upon the net income earned between March 26 and June 26, stating, in part, as follows:

> The business operated by the sellers during the Buyer's Business Period and the net profits accruing therefrom were the business and the profits of the sellers. The fact that their agreement required them to deliver that business and those profits to Kungsholm does not detract from the fact that, by use of their own property, the sellers as a firm made profits and that as a matter of law the partners became liable for income taxes on such profits in the year when they accrued.
>
> \* \* \* \* \* \* \*
>
> By their contract, the Century partners undertook to dispose of the income of the partnership during the Buyer's Business Period. The power to dispose of income is the equivalent of ownership of it and the exercise of the power to procure its payment to another is within the reach of the statute taxing income "derived from any source whatever." \* \* \*

In our opinion the rationale of the *Hulbert* case is in accord with our analysis of the transaction herein and is controlling. See also

*Rouss* v. *Bowers*, (C. A. 2, 1929) 30 F. 2d 628, certiorari denied 279 U. S. 853, affirming 4 B. T. A. 516. The amount of $58,089.74 credited to the petitioner in the instant case in connection with the closing adjustments on June 15, 1949, did not represent income earned by the petitioner and taxable to it.

*Decision will be entered under Rule 50.*