PACIFIC COAST MUSIC JOBBERS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CHARLES H. HANSEN AND ISABEL HANSEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 284-68, 285-68. Filed February 25, 1971.

*A. Walter Socolow*, for the petitioners.
*Agatha L. Vorsanger*, for the respondent.

STERRETT, *Judge:* The respondent determined a deficiency in the Federal income taxes of the petitioner Pacific Coast Music Jobbers, Inc., of $4,605.28 and $6,769.09 for its taxable years ending August 31, 1963, and August 31, 1964, respectively. A deficiency of $11,419.89 was also determined by respondent in the Federal income taxes of the petitioners Charles H. Hansen and Isabel Hansen for the taxable year ended December 31, 1964.

We have before us two issues for consideration. We are first to determine whether petitioner Pacific Coast Music Jobbers', Inc.'s election to be treated as a small business corporation under subchapter S was terminated in 1962, and thus not in effect during the years

in issue, under section 1372(e)(1)[1] for the failure of a new shareholder to consent to that election. This requires us first to ascertain whether petitioner Charles H. Hansen became that shareholder in 1962. The second issue before us is whether petitioner Charles H. Hansen constructively received dividends from the petitioner Pacific Coast Music Jobbers, Inc., in 1964.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations of facts and the exhibits attached therto are incorporated herein by this reference.[2]

Pacific Coast Music Jobbers, Inc. (sometimes hereinafter referred to as Pacific or the company), is a corporation organized under the laws of California. At the time of filing its petition herein Pacific's principal place of business was San Francisco, Calif. Pacific reported its income on an accrual basis utilizing a fiscal year ending August 31. For the taxable years ended August 31, 1963, and August 31, 1964, Pacific filed U.S. small business corporation returns of income with the district director of internal revenue, San Francisco, Calif. An election to be taxed as a small business corporation pursuant to section 1372 had been filed by Pacific on November 28, 1958.

Petitioners Charles H. Hansen (sometimes hereinafter referred to as Hansen) and Isabel Hansen, husband and wife, filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, Jacksonville, Fla. At the time of filing their petition herein Charles and Isabel Hansen resided in Miami Beach, Fla.

At all times relevant hereto, Pacific had 50 shares of stock issued and outstanding. Pacific's business was the distribution of music. As of November 23, 1962, James L. Haley (sometimes hereinafter referred to as Haley) and Peter L. Caratti (sometimes hereinafter referred to as Caratti) each owned 20 shares of stock, and Miss Mary W. Thomson (sometimes hereinafter referred to as Miss Thomson) owned 10 shares of stock. Prior to November 23, 1962, Haley and Caratti and Miss Thomson (sometimes hereinafter collectively referred to as sellers) were all officers and full-time employees of Pacific. They managed all its day-to-day and overall business activities.

Haley began to look forward to retirement in the early part of

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

[2] Prior to trial respondent took the depositions of James L. Haley, Peter L. Caratti, and Mary W. Thomson, but offered only Haley's deposition into evidence. Petitioner then offered selected portions of Caratti's and Miss Thomson's depositions. The Court has received all the depositions in their entirety as court exhibits. So we need not determine whether the deponents are witnesses of the petitioner or respondent.

1961 and asked Hansen to buy his interest in Pacific. Hansen was reluctant to put his own money in Pacific, and did not consider Pacific a salable business because it was restricted to jobbing. An unsuccessful effort was made by Hansen to find a buyer for Haley's interest. When three prospects did not work out, Hansen then expressed an interest in purchasing all the stock in Pacific, and not merely Haley's share. Caratti and Miss Thomson agreed to sell their interests in Pacific since they also wanted to retire.

Haley continued to discuss the possible sale of Pacific with Hansen and with Philip Becker (hereinafter sometimes referred to as Becker), an accountant, who had been Hansen's financial adviser for approximately 25 years. Hansen relied very heavily on Becker's skill and judgment in the negotiation and consummation of the transaction in issue as well as the purchase of Capital Music Co., a Seattle, Wash., company in a similar business. In 1962 negotiations were conducted between Becker, representing Hansen, and Leo J. O'Brien, an attorney, and Richard F. Tyler, an accountant, representing the sellers.

During the negotiations with Becker and Hansen for the sale of Pacific, Haley was of the opinion that the corporation was worth between $80,000 and $100,000. Haley's opinion of the value of the business was based in part on his estimate of income the business would produce during the 5 years subsequent to 1962, and also on the price paid by Hansen for the purchase of Capital Music Co. Hansen purchased Capital in 1961 for approximately $60,000. Capital's sales were about the same as Pacific's, but it had no profits. In the 5 years immediately preceding the transaction in issue, Pacific had profits each year ranging between $16,000 and $26,000 per year.

Hansen felt that Pacific was worth more than Capital. His financial adviser, Becker, felt Haley was overvaluing Pacific and that the company was really worth between $25,000 and $30,000. Becker's valuation was based on his belief that, due to the nature of the business, the prior profit level could not be maintained once the key people, the sellers, left the business.

Before entering into any agreement with the sellers, Becker did a study of Pacific's business over the last 10 previous years and was familiar with its earnings. Hansen was similarly aware of Pacific's earnings.

When Becker heard that the sellers were basing their valuation of the business on 5 years' earnings, it occurred to him that Hansen could arrange to have the sellers enjoy the earnings of the company for a period which would allow them to realize the price they had in mind, and then Hansen could take over the stock. Resultingly, Becker asked

the sellers to submit a list of what they would expect to earn over a 5-year period. The sellers submitted a list which Becker found reasonable and accepted. The notion of receiving payments over a 5-year period was acceptable to the sellers because they felt their taxes would be lower than if they received a large lump-sum amount for their stock.

On November 23, 1962, Hansen simultaneously entered into two agreements with each of the sellers. The terms and conditions of each pair of agreements were substantially identical except that the amounts due Miss Thomson were smaller to reflect her lesser stock interest.

The first or main agreement entered into by each seller provided that the seller agreed to sell his Pacific stock to Hansen for $500 per share. The document contained express conditions that the corporation continue its usual business at least until August 31, 1967, that each stockholder have the right to receive all dividends and earnings until August 31, 1967, and that all shares continue to be registered in the selling stockholders' names until October 1, 1967. The first agreement also provided that the stock certificates were to be endorsed and delivered to Leo J. O'Brien to be held by him in escrow until October 1, 1967, at which time they were to be delivered to Hansen. It was further agreed by the sellers that they would continue Pacific's status as a small business corporation until August 31, 1967, and that they would report and pay taxes on their respective shares of Pacific's income until that same date. Finally, the first agreement required the sellers to execute and deliver to Hansen their irrevocable proxies authorizing him to exercise full rights to vote the stock during the entire period of the escrow.

It was originally anticipated that the sellers would be paid the total of $25,000 called for by the first agreement at such time that the stock was transferred out of the escrow in 1967. However, after some additional discussion before the agreements were signed, Hansen agreed to pay Haley his $10,000 at the time the agreements were executed, to pay Caratti his $10,000 a year later, and to pay Miss Thomson's $5,000 share in October 1964. The agreements were drafted to reflect this arrangement. While Caratti received his money on the date provided for, Miss Thomson did not in fact receive hers until 1965, a year later than provided for.

The second or supplemental agreement was stated to be an "agreed amendment and supplement to the agreement being executed between us simultaneously herewith." This agreement stated that, "notwithstanding the provisions" of the first agreement, Hansen agreed that

Pacific would pay to each seller "as dividends, earnings or other ordinary income" on his or her respective block of shares:

| Haley and Caratti | Miss Thomson | Year ending Aug. 31— |
|---|---|---|
| $6, 500 | $3, 250 | 1963 |
| 6, 200 | 3, 100 | 1964 |
| 5, 900 | 2, 950 | 1965 |
| 5, 600 | 2, 800 | 1966 |
| 5, 300 | 2, 750 | 1967 |

The sellers agreed that if Pacific's income exceeded these amounts, the excess would not be distributed to them but would be held and accrued for Hansen as ultimate owner of the stock of Pacific, who in turn agreed to pay all income taxes attributable to any such undistributed earnings. Hansen also agreed that if Pacific's earnings would not be sufficient to provide the amounts specified, he would make up the differences, and that if he did not make up such deficiencies within 90 days after demand the escrow agent would reconvey the stock to the sellers. It was agreed that all payments under the second agreement would be in such form as to constitute ordinary income to the sellers.

In accordance with the first agreement, the sellers delivered their duly endorsed stock certificates to O'Brien as escrow agent. O'Brien received the stock and held it pursuant to an escrow instruction agreement executed by the sellers and Hansen. The stock, however, continued to be registered in the sellers' names until 1967.

The sellers perceived the arrangement here at issue as yielding them $87,500: $25,000 paid according to the main agreements and $62,500 payable in equal annual installments, divided as their interests appeared over 5 years with 6-percent interest on the unpaid balance. Also the sellers regarded the escrow as a security arrangement designed to ensure that they received the payments due under the agreements.

On several occasions the payments due the sellers under the supplemental agreement were made 2 or 3 months after the close of Pacific's fiscal year. Interest for the 2- or 3-month period in the amount of 6 percent was added to the payment. The interest payments had the effect of reducing the company's income available for distribution. Becker was unaware of these interest payments when they were being made. However, Miss Thomson, who was then responsible for issuing Pacific's checks, did discuss the matter with John J. Houdek who was then the manager of Pacific. Prior to the execution of the agreements in October of 1962 it was the custom of Pacific to pay dividends to its stockholders in the January subsequent to the close of the fiscal year in August, and not to pay interest on account of the intervening period.

For the taxable year ended August 31, 1963, the taxable income of

Pacific was $16,250, the same amount as was due the sellers under the supplemental agreements of November 23, 1962. For the taxable year ended August 31, 1964, the taxable income of Pacific was $26,407.79. Of this amount, however, only $15,500 was initially paid to the sellers, since this was the amount required to be paid under the terms of the supplemental agreements. The sellers, however, included their ratable shares of the whole amount of the 1964 profit in their respective personal returns and paid taxes on those shares. The total profits for the 5-year period of the agreement aggregated $85,383.51.

Haley received a payment from Pacific of approximately $1,300 to reimburse him for taxes paid on a portion of Pacific's undistributed taxable income which he reported in his income tax return but did not immediately receive. Caratti and Miss Thomson also received such payments during the year 1964. These amounts were apparently paid out of Pacific's undistributed income. Hansen himself made no payments to the sellers other than the total of $25,000 called for by the main agreements.

Ultimately the sellers received all of Pacific's fiscal year 1964 undistributed income. They also received all the earnings of Pacific for the full 5-year period of the agreement although such payments exceeded the amounts set out in the supplemental agreement. No explanation was given for this fact.

Becker did not request a certified balance sheet from the sellers in 1962, nor did he request an audit or an accounting of debts, taxes, or other obligations of Pacific. However, a complete inventory was taken by Haley and Caratti in the presence of two men Hansen sent up from Los Angeles.

Haley retired on December 15, 1962, and performed no services for Pacific after that date. He did not attend stockholders meetings or participate in the management of Pacific in any manner. However, Haley did not resign as a director until 1967.

Upon Haley's retirement, Houdek, who had been an employee of Hansen for approximately 15 years and his manager in Seattle, assumed Haley's duties at Pacific and took over management of the company. In January 1963 he was elected vice president of Pacific and thereafter managed Pacific until his death in October 1966. Upon the death of Houdek, Hansen sent a Mr. Craig from New York as a replacement.

Caratti worked as a full-time employee of Pacific until May 1963 and thereafter worked for Pacific 1 day per week. Miss Thomson, on November 14, 1962, signed an employment agreement with Pacific which provided she would be employed until October 1, 1965, and would not engage in any other commercial business during that time.

This agreement was signed for Pacific by Houdek, its then manager, on April 17, 1963. After November 1962, Miss Thomson worked under the terms of the agreement until her retirement in 1965. Thereafter Miss Thomson continued to work 1 day per week until 1967.

After the execution of the agreements of November 23, 1962, the sellers did not attend any stockholders or directors meetings for Pacific. They did, however, sign, as directors, minutes for a meeting of the board of directors of Pacific on August 31, 1963. The minutes show that the directors approved and ratified all corporate acts of the preceding fiscal year, and, further, declared the company's undistributed taxable income to be due and payable as dividends to the stockholders. A similar set of minutes was prepared and signed for August 31, 1964.

During the year in issue Hansen had at least eight corporations operating in some facet of the music business in various parts of the country. For those corporations not located close to him, Hansen employed a manager. Hansen was provided with weekly statements by some of the companies, and annual reports were made to Becker, Hansen's accountant. All financial matters concerning such companies would be referred to Becker.

During the years 1962 through 1967, Hansen did not serve as an officer or director of Pacific nor did he participate directly in the management of the company. He received no salary, advances or loans, nor any dividends or profits from Pacific. Also he participated in no stockholder meetings of Pacific. The only services Hansen rendered Pacific during the 5-year period were through Houdek, the manager. Houdek answered directly to Hansen.

During the 5-year period, Miss Thomson continued to draw and sign checks for the business as she had before the transaction in question. Haley could not draw checks because Houdek had replaced him in this capacity.

Although Hansen did not have a day-to-day familiarity with the business of Pacific, he was generally aware of the financial affairs and operations of Pacific during the period 1962 through 1967. Hansen received regular reports from Houdek. He also received annual reports on profit and loss, and expenses of Pacific.

Tyler, who was the sellers' accountant, continued to be the accountant for Pacific during the years involved herein, and kept Becker informed concerning the records, accounts, and all activities of Pacific. He requested Becker's advice on how to report inventory and determine profits for fiscal year 1963 because the inventory sheets had been lost. Tyler also prepared the minutes of the directors meetings referred to above, and submitted them to Becker prior to their signature for his opinion.

During all periods involved herein, Hansen did not file a consent to the election by Pacific to be taxed as a small business corporation.

Pacific received from the respondent a statutory notice dated October 20, 1967, which said:

It has been determined that Mr. C. Hansen became a new shareholder in Pacific Coast Music Jobbers, Inc., on November 23, 1962 and that his failure to file a timely consent to the corporation's election not to be subject to Federal Income tax under the provisions of section 1372 of the Internal Revenue Code of 1954 caused a termination of that status under the provisions of section 1372(e)(1) of the 1954 Code. Accordingly, the taxable income of the corporation, as set forth in the corporate income tax returns filed for the taxable years 1963 and 1964, is subject to the tax imposed under section 11 of the Internal Revenue Code of 1954.

Respondent sent petitioner Hansen a statutory notice also dated October 20, 1967, in which it was stated:

It has been determined that the dividends paid by Pacific Coast Music Jobbers, Inc. during the year 1964 in the sum of $31,750.00 constituted dividends constructively received by you and, therefore, are includible in your income in 1964 pursuant to section 61 of the Internal Revenue Code of 1954. Accordingly, your taxable income is increased by $31,650.00 ($31,750.00 less $100.00 dividend exclusion granted under section 116 of the Internal Revenue Code of 1954).

### OPINION

The first question to be considered is whether petitioner Hansen became a stockholder of the petitioner Pacific Coast Music Jobbers, Inc., on November 23, 1962, and was thus required to file a consent to Pacific's election under subchapter S not to be subject to income tax.[3] It has been stipulated that Hansen filed no such consent for any of the years in issue. If Hansen did become a shareholder as a result of sale agreements executed between him and the shareholders at that time, then Pacific's status under subchapter S was terminated for the failure of the new stockholder to file a consent to that status, and the company became subject to income taxes at the usual corporate rates.[4] We hold

---

[3] SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

(a) ELIGIBILITY.—Except as provided in subsection (f), any small business corporation may elect, in accordance with the provisions of this section, not to be subject to the taxes imposed by this chapter. Such election shall be valid only if all persons who are shareholders in such corporation—

(1) on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, or

(2) on the day on which the election is made, if the election is made after such first day,

consent to such election.

[4] SEC. 1372(e). TERMINATION.—

(1) NEW SHAREHOLDERS.—An election under subsection (a) made by a small business corporation shall terminate if any person who was not a shareholder in such corporation—

(A) on the first day of the first taxable year of the corporation for which the election is effective, if such election is made on or before such first day, or

(B) on the day on which the election is made, if such election is made after such first day,

becomes a shareholder in such corporation and does not consent to such election within such time as the Secretary or his delegate shall prescribe by regulations. Such termination shall be effective for the taxable year of the corporation in which such person becomes a shareholder in the corporation and for all succeeding taxable years of the corporation.

that Hansen did in fact become a shareholder of Pacific upon execution of the agreements, and that accordingly Pacific's status as an electing small business corporation [5] under subchapter S was terminated effective November 23, 1962.

For purposes of Federal income taxation the determination of whether a sale has occurred centers more on the question of which party, as a result of the transaction, has command or domination over the property, rather than on the refinements of title. *Ted F. Merrill*, 40 T.C. 66, 74 (1963), affirmed per curiam 336 F. 2d 771 (C.A. 9, 1964); *Estate of Arthur L. Hobson*, 17 T.C. 854, 861 (1951); *W. H. Hay*, 25 B.T.A. 96, 101 (1932). A court must consider not only when the bare legal title passed but also when the benefits and burdens of the property, or the incidents of ownership, were acquired or disposed of in a closed transaction. *Ted F. Merrill, supra; North Carolina Lumber Co.*, 19 T.C. 587 (1952), reversed on other points 211 F. 2d 543 (C.A. 4, 1954); *Commissioner* v. *Union Pac. R. Co.*, 86 F. 2d 637 (C.A. 2, 1936). In deciding the question, the court looks to that party to the transaction who has the greatest number of the attributes of ownership. *Boykin* v. *Commissioner*, 344 F. 2d 889 (C.A. 5, 1965); reversing a Memorandum Opinion of this Court; *Northern Trust Co. of Chicago* v. *United States*, 193 F. 2d 127, 129 (C.A. 7, 1951); *De Guire* v. *Higgens*, 159 F. 2d 921 (C.A. 2, 1947), concurring opinion of Clark, *J.* A court should look to practicalities, disregarding merely formal and not useful rights and attributes. *Northern Trust Co., supra.* If it is found from all the facts and surrounding circumstances that the parties intended an agreement to result in the sale of property, and the agreement transfers substantially all the accouterments of ownership, the transaction will be treated as a sale even though the parties intended the legal title should not pass until later. *Karl R. Martin*, 44 T.C. 731, 741 (1965), modified 379 F. 2d 282 (C.A. 6, 1967). Since courts cannot successfully conjecture as to the subjective intent of the parties, the objective evidence of intent provided by the parties' overt acts must be relied upon. *Ragland Investment Co.*, 52 T.C. 867, 876 (1969), affd. 435 F. 2d 118 (C.A. 6, 1970).

The first of a pair of agreements individually entered into between Hansen and each of the sellers, Haley, Caratti, and Miss Thomson, stipulated that they would receive $500 per share for their stock, i.e., a total of $25,000 for the outstanding 50 shares of Pacific. Supple-

---

[5] SEC. 1371. DEFINITIONS.

(b) ELECTING SMALL BUSINESS CORPORATION.—For purposes of this subchapter, the term "electing small business corporation" means, with respect to any taxable year, a small business corporation which has made an election under section 1372(a) which, under section 1372, is in effect for such taxable year.

mental agreements executed the same day provided that the sellers would each receive for the ensuing 5 years certain fixed amounts designated as dividends. Anything in excess of the fixed amounts was to remain in the company for the benefit of Hansen although the sellers would include the excess in their individual income computation for Federal income tax purposes. For its fiscal year 1964 Pacific reported earnings of $26,407.79. This amount was included in the individual income tax returns of the sellers although only the total amount of $15,500 called for in the supplemental agreements was actually distributed to them in that year. Any tax liability incurred by the sellers as a result of their including in their respective returns amounts in excess of distributions was to be made up by Hansen. The evidence indicates this happened at least once during the 5-year life of the agreement by means of a distribution from Pacific of approximately $1,300 to each seller. Additionally Hansen was required to pay the sellers any disparity between the net income of Pacific available for distribution and the amounts fixed in the supplemental agreements. Thus this latter agreement provided in effect that the sellers would not get the full benefit of Pacific's business success nor would they suffer the burden of reverses. Rather it was Hansen who stood in that position. *Ted F. Merrill, supra.*

The stock of Pacific was endorsed by the sellers and placed in an escrow subject to the conditions of the agreements. Essentially the only real condition bearing upon the escrow was that the required payments be made as provided for. The required payments were to be made in installments over a series of years, and there were no other substantial conditions precedent to the sale such as Government approval of the transaction. Compare *Ted F. Merrill*, 40 T.C. at 77, with *Albert E. Dyke*, 6 T.C. 1134, 1139 (1946) ; and *Joseph L. O'Brien Co.*, 35 T.C. 750, 752 (1961), affd. 301 F. 2d 813 (C.A. 3, 1962). Thus the escrow was merely a device whereby the sellers could ensure Hansen's payment of the obligated amounts, *Moore* v. *Commissioner*, 124 F. 2d 991, 993 (C.A. 7, 1941), reversing in part 42 B.T.A. 949 (1940) ; *Commissioner* v. *Union Pac. R. Co., supra* at 639; *Long* v. *United States*, 66 Ct. Cl. 475 (1928).

The sellers were of the view that the stock was worth between $80,000 and $100,000 based upon what they thought Pacific could earn over a period of 5 years. Although Hansen's financial adviser, Becker, thought the stock would be worth only $25,000 or $30,000 once the sellers were no longer active in the business, Hansen himself thought the business was worth more than Capital Music Co. of Seattle, which Hansen had purchased for about $60,000 in 1961. Capital

had the same sales as Pacific but had no profits. On balance it appears that the parties to the sale agreed that the stock in Pacific would be sold to Hansen for a total price of $87,500. The main agreements provided for a downpayment of $25,000 divided according to the respective stock interests of the sellers and paid to each when they ceased full-time employment in the business. The balance of the purchase price was to be paid over a 5-year period at the rate of $5,000 per year each to Haley and Caratti, and $2,500 per year to Miss Thomson, with 6-percent interest on the unpaid balance. An analysis of the amounts due under the supplemental agreements supports this view. For instance the differences between $5,000 and the amounts due Haley and Caratti each year under the supplemental agreements, i.e., $1,500, $1,200, $900, $600, and $300, represent 6-percent interest on the unpaid balance for 5 years, 4 years, 3 years, 2 years, and 1 year, respectively. Hansen was acquiring Pacific by means of a bootstrap purchase in which profits from operations were being used to acquire the business. See *Commissioner* v. *Brown*, 380 U.S. 563, 571 (1965).

While the stock was in escrow, the dividends paid by Pacific were being used to amortize Hansen's obligation to the sellers. Such an arrangement fortifies our conclusion that a sale took place in 1962 because there remained nothing for the sellers to do but collect their money and, in the meantime, Hansen was getting the benefit of the dividends. *Northern Trust Co. of Chicago* v. *United States, supra* at 131; *Moore* v. *Commissioner*, 124 F. 2d at 991, 993; *Lee* v. *Commissioner*, 143 F. 2d 4, 6 (C.A. 7, 1949); *Alfred N. Hoffman*, 47 T.C. 218, 233 (1966); *Estate of Arthur L. Hobson*, 17 T.C. 854, 861 (1951).

To a certain extent the supplemental agreement made Hansen's obligation a nonpersonal one, because the sellers' sole remedy if the stipulated dividends were not paid was to receive back the stock. However, at the execution of the agreements Hansen invested $10,000 in the deal with the payment to Haley and another $10,000 a year later, and the entire $25,000 due under the main agreement was to be paid 3 years before the escrow closed. With Hansen's substantial investment in the contract within the first year, it is unlikely he would opt not to complete the payments and acquire the stock. *Moore* v. *Commissioner, supra.*

Evidence for our conclusion that a completed sale of the stock to Hansen took place in 1962 is not limited to the facts and circumstances surrounding the amount and payment of the purchase price. In agreeing to continue both Pacific's usual operations and its status as an electing small business corporation under subchapter S for the 5 years of the escrow period, the sellers gave up significant rights to alter or

end the business. Substantial domination and control over Pacific was also lost by the sellers when they gave Hansen their irrevocable and apparently unqualified proxies. Haley gave up management of the business when the agreements were executed and was replaced by Houdek, who was a long-time employee of Hansen prior to joining Pacific. Caratti left not very long after Haley. Although Miss Thomson stayed on for 3 years, her continuation was under an employment contract which was signed for Pacific by Houdek. It appears that Houdek reported to Hansen on a regular basis. Hansen did not participate directly in the business, but his managerial relationship to Pacific was like his supervisory pattern with respect to other similar companies he owned. The sellers' accountant, Tyler, did continue with Pacific, but, subsequent to 1962, he followed the practice of keeping Becker informed as to the company's affairs. Although Hansen was not active in the day-to-day management of Pacific, it is clear that he exercised domination and control over the company through Becker and Houdek, and, potentially, the proxies. Hansen's possession of domination and control over Pacific indicates he had acquired the company's stock through which such power could be exercised. *See Ted F. Merrill, supra* at 76; *North Carolina Lumber Co.*, 19 T.C. at 599; *Union Pac. R. Co., supra;* cf. *2 Lexington Ave. Corp.*, 26 T.C. 816, 822, 825 (1956).

We are not unaware of the fact that the sellers' attorney, O'Brien, testified he thought the sale took place in 1967 when the escrow closed. However, as we noted above, the important fact is not when the parties intended title to change hands but when they intended the accouterments of ownership to be transferred. *Karl R. Martin, supra.*

That the sellers continued as officers and directors of Pacific until 1967, and signed corporate minutes in these capacities is not of great moment. Such offices are occupied at the pleasure of the shareholders. There was but one shareholder after November 23, 1962, and that was Hansen. In any event, Hansen had irrevocable proxies to vote the stock as he wished.

The total amount due the sellers under both agreements was $73,850. Becker, Hansen's financial adviser and accountant, testified that over the 5-year period of the escrow Pacific earned $85,383.51, all of which was distributed to the sellers. Other testimony in the record indicates the sellers received all the earnings of Pacific during the 5-year period. The fact of total distribution would seem to support the position advanced by the petitioners. However, the difference between the amount due under the agreements and the amount apparently distributed is in part explained by the distributions of approximately

$1,300 to each of the sellers to cover taxes on undistributed income of Pacific included in their tax returns, and in part by the fact that additional interest was paid on the amounts due under the supplemental agreement when such amounts were distributed 2 or 3 months after the close of the fiscal year. The remaining balance of the disparity is not a factor sufficient to alter the dominant thrust of the other factors here present.

To be sure Becker did not request a certified balance sheet from the sellers in 1962 or make an audit. However, a horse is nonetheless sold although the vendee fails to look in its mouth. And in any event Haley testified that an inventory was made with Hansen's men present.

An examination of the whole record causes us to conclude that Hansen became the beneficial owner of all the outstanding shares of Pacific on November 23, 1962. As beneficial shareholder he was required to file a consent to Pacific's election to be treated as an electing small business corporation under subchapter S, if that election was to continue. *Alfred N. Hoffman, supra;* see *Harold C. Kean,* 51 T.C. 337 (1968); sec. 1.1371–1(d)(1), Income Tax Regs.[6] His failure to file such a consent caused a termination of the Pacific's subchapter S status for the company's taxable years ending August 31, 1963, and August 31, 1964. Accordingly Pacific's income for those years is subject to the tax imposed by section 11 on corporations.

Next we turn to the question of whether Hansen received dividends from Pacific in the amount of $31,750 during the calendar year 1964. Hansen does not question the amount of the alleged dividend, nor does he assert it was not distributed in 1964. We have determined that Hansen was the beneficial owner of all the stock of Pacific during the periods in issue and that all the dividends paid by Pacific during the periods in issue were being applied to the agreed price for the stock held in escrow. Under these circumstances we hold that the dividends in the amount of $31,750 distributed by Pacific in 1964 to the sellers were properly includable in Hansen's income for that year. *Moore* v. *Commissioner, supra; Estate of Arthur L. Hobson, supra* at 861; *Alfred N. Hoffman, supra* at 233; *Louis H. Zipp,* 28 T.C. 314, 329 (1957), affd. 259 F. 2d 119 (C.A. 6, 1958).

In accordance with the foregoing,

*Decisions will be entered for the respondent.*

---

[6] In pertinent part this regulation provides as follows:
Ordinarily, the persons who would have to include in gross income dividends distributed with respect to the stock of the corporation are considered to be the shareholders of the corporation. * * *