Gap Anthracite Co., et al. [1] v. Commissioner. Gap Anthracite Co. v. Commissioner
Docket Nos. 726-68, 727-68, 5032-68, 4407-69.
United States Tax Court
T.C. Memo 1972-189; 1972 Tax Ct. Memo LEXIS 68; 31 T.C.M. (CCH) 924; T.C.M. (RIA) 72189; August 29, 1972
Sheldon M. Bonovitz, Duane, Morris & Heckscher, 1617 Land Title Bldg., Philadelphia, Pa., and Ronald F. Kidd, for the petitioners in Docket Nos. 726-68, 727-68, and 4407-69. Merle A. Wolfson, Sichael R. Harris, and Andrew Hourigan, Jr., for the petitioner in Docket No. 5032-68. Edward L. Newberger, for the *69 respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following income tax deficiencies in these consolidated cases: Taxable year
Docket No.
Petitioner
ended
Deficiency
726-68
Gap Anthracite Co
12/31/61
$ 1,653.93
9/30/62
151,839.98
9/30/64
16,114.61
727-68
Grant Anthracite Co.
12/31/61
5,366.04
9/30/62
142,854.34
5032-68
Glen Nan Coal Co.
6/30/63
184,335.51
6/30/64
242,851.92
6/30/65
78,240.84
4407-69
Susquehanna Coal Co.
9/30/62
403,784.58
9/30/63
55,920.81
Due to the extensive efforts of the parties, most of the issues in these cases have been settled and most of the facts relating to the disputed issues have been stipulated. The two questions remaining for our consideration are: (1) whether either, neither, or both petitioners in Docket Nos. 5032-68 and 4407-69 have an economic interest in certain coal-producing property so as to permit the taking of a deduction for depletion with respect to that property; and (2) whether the petitioners in Docket Nos. 726-68 and 4407-69 changed their method of accounting with respect to an allegedly *70 material item without the Commissioner's consent. [2]
General Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Glen Nan Coal Co., Inc. (hereinafter referred to as Glen Nan) is the original petitioner in Docket No. 5032-68 [3] and had its 925 principal place of business in Wilkes-Barre, Pennsylvania, at the time of the filing of its petition herein. At all times pertinent hereto, Glen Nan and its predecessor-ininterest, L. Biscontini & Sons (hereinafter referred to as Biscontini), a partnership, were engaged in mining coal from certain lands henceforth referred to as the Newport Lands. *71 For the fiscal year ended June 30, 1963, Glen Nan timely filed its Federal income tax return with the district director of internal revenue at Scranton, Pennsylvania. For the fiscal years ended June 30, 1964 and June 30, 1965, Glen Nan timely filed such returns with the district director of internal revenue at Philadelphia, Pennsylvania. Susquehanna Coal Company (hereinafter referred to as Susquehanna), the petitioner in Docket No. 4407-69, had its principal place of business in Nanticoke, Pennsylvania, at the time of the filing of its petition herein. At all times pertinent hereto, the corporation was engaged primarily in the business of processing coal mined by Glen Nan from the Newport Lands and selling such processed coal on both the wholesale and retail markets. For the fiscal year ended September 30, 1962, Susquehanna timely filed its Federal income tax return with the district director of internal revenue, Scranton, Pennsylvania. For the fiscal year ended September 30, 1963, it timely filed its return with the district director of internal revenue, Philadelphia, Pennsylvania. Gap Anthracite Co. (hereinafter referred to as Gap), the petitioner in Docket No. 726-68, had *72 its principal office at Nanticoke, Pennsylvania, at the time of the filing of its petition herein. It filed its Federal income tax return for the calendar year 1961 with the district director of internal revenue at Scranton, Pennsylvania. For the fiscal years ended September 30, 1962 and September 30, 1964, it filed its returns with the district director at Philadelphia, Pennsylvania. Issue 1. Depletion Issue Findings of Fact On or before June 30, 1958, Glen Alden Corporation (hereinafter referred to as Glen Alden) was the owner of the Newport Lands. The M. A. Hanna Company (hereinafter referred to as Hanna), a predecessor of Susquehanna, was a large coal mine operator. During the 1950's, it was pursuing a long-term policy of divesting itself of coal mining operations and limiting itself to selling coal. Some time prior to June 17, 1958, Hanna had abandoned operation of its Glen Lyon breaker, which was located near the Newport Lands. Biscontini, at this time, was engaged in mining and stripping coal from various properties owned by Hanna and Glen Alden, including the Newport Lands. However, in 1958, stripping work was becoming scarce, mines were "playing out," and, as a *73 result, Biscontini was running out of work. Biscontini considered purchasing the Newport Lands to remedy this situation, but felt that Glen Alden would not deal with it because of its small size and because Glen Alden considered Biscontini to be only a contractor. C. A. Gibbons, who headed the Susquehanna Collieries Division of Hanna, and Laurence Biscontini, a partner in Biscontini, were close friends and, at some point prior to June 17, 1958, they discussed the purchase of the Newport Lands from Glen Alden in light of all of the aforementioned circumstances and the aspirations of Hanna and Biscontini. Biscontini and Hanna subsequently entered into a series of agreements relating to the purchase of the Newport Lands and the sale of the coal produced therefrom. The General Agreement, dated June 17, 1958, recited that Hanna was purchasing the Newport Lands from Glen Alden for $1,600,000, [4] with Hanna paying $275,000 down and giving a mortgage of $1,325,000, payable at $40,000 per year minimum plus 20 cents a ton on all coal mined and sold from the property above 200,000 tons in any one year. The General Agreement provided that Biscontini was to advance Hanna $275,000 (it subsequently *74 did so) "as down payment on the purchase price which Hanna is making to Glen Alden Corporation for said property" and pay all taxes on the property. Hanna agreed to deliver a quitclaim deed of the Newport Lands to 926 Biscontini on September 1, 1961, and Biscontini "[agreed] to assume the obligations of the aforesaid Mortgage." Hanna reserved the right to be the exclusive sales agent for all coal produced from the property until exhaustion and required that an Agreement to that effect shall be recorded or a provision be inserted in the Deed which so far as possible shall have the effect of a covenant running with the land." [5]
Hanna also agreed to convey certain surface rights to Biscontini at the latter's request provided Biscontini built a new breaker on the property and paid Hanna a royalty of 2 1/2 cents per ton on all coal processed at the site. The General Agreement further provided that if Biscontini *75 defaulted upon the mortgage and Glen Alden commenced foreclosure proceedings, Biscontini would convey the Newport Lands to Hanna, subject to the mortgage, for $1.00. The $275,000 furnished by Biscontini was made the subject of an escrow agreement, which provided that it was to be returned to Biscontini if the agreement for the acquisition of the Newport Lands from Glen Alden was not completed. Simultaneous with the General Agreement, Hanna and Biscontini executed a supplementary agreement reciting Hanna's undertaking to convey to Biscontini the Newport Lands being acquired from Glen Alden and providing that the General Agreement be amended to provide "that Biscontini, or his assignee, shall assume to Glen Alden the obligations in the mortgage between Glen Alden and Hanna." Also on June 17, 1958, Hanna, through its Susquehanna Collieries Division, entered into an Operating Agreement with Biscontini which was to remain in effect until August 31, 1961. Biscontini was to assume generally all costs of mining and delivering coal from the Newport Lands to Hanna's Glen Lyon breaker and was to receive a flat rate of $18 per 100-cubic-foot mine car. In addition, Biscontini agreed to reimburse *76 Hanna on a quarterly basis for real estate taxes on the Newport Lands and to pay Hanna a minimum of $40,000 per year plus 20 cents per gross ton over 200,000 tons on all coal mined from the Newport Lands; a contemporaneous agreement provided that Hanna would apply all such payments to the Glen Alden mortgage. Hanna retained a sizeable number of controls under the Operating Agreement, including the rights to suspend work by Biscontini; to terminate the agreement on two weeks' notice for cause (that determination being at the sole discretion of Hanna); to suspend production as Hanna's business conditions required; to inspect the operation at any time in order to be sure Biscontini was complying with the terms of the agreement; to terminate the agreement on account of specified financial difficulties of Biscontini or adverse action on Biscontini's part; and to terminate the agreement if the operations proved unprofitable to Hanna. Biscontini agreed to surrender the premises to Susquehanna upon the termination of the agreement "in any way or from any cause or causes." The Operating Agreement prohibited the assignment or other disposition by Biscontini of its rights thereunder, but, by *77 a contemporaneous agreement, Hanna consented to its assignment to a corporation controlled by the Biscontini family. It further provided that the various provisions for approval or direction of Hanna were not to constitute "control or management" by the latter. A Sales Agreement, also dated June 17, 1958, granted Hanna the exclusive right to sell coal as long as it was produced from the Newport Lands at a 5 1/2 percent commission. [6]
Glen Alden insisted that the down payment be $375,000. Hanna loaned Biscontini $100,000, which was then paid to Glen Alden as part of the down payment. Biscontini gave Hanna a $100,000 note, dated June 30, 1958, bearing 4 percent interest per annum and due September 1, 1961. [7] The payment of the note was made "a condition precedent to the carrying out of said agreement to transfer said property to Borrower." *78 On June 30, 1958, Glen Alden deeded the Newport Lands to Hanna for a purchase price of $1,600,000, payable as described hereinabove. The mortgage (in the amount of $1,225,000 bearing no interest and with a right of anticipation) provided that Hanna could sell the property and assign the 927 mortgage thereon without recourse by Glen Alden if (1) Hanna retained the exclusive right to sell all coal produced from the Newport Lands and (2) the assignee agreed to be legally bound by the terms and conditions of the mortgage. After June 30, 1958, Biscontini, and, later, Glen Nan, continued to mine and deliver coal from the Newport Lands to the Glen Lyon breaker. The price per cubic foot varied from time to time in accordance with subsequent agreements between Hanna, Biscontini, and their successors, in order to take into account the competitive situation in the coal industry. On October 29, 1958, Hanna conveyed its Collieries Division including its interest in the Newport Lands, to a wholly-owned subsidiary, Susquehanna Collieries Company (hereinafter referred to as Collieries), which assumed all of the obligations under the Glen Alden mortgage. Collieries then leased the property *79 back to Hanna, under the terms of which lease Hanna agreed to pay Collieries a minimum "royalty" of $3,333.33 per month (or the equivalent of 20 cents per ton on 16,667 gross tons) and 20 cents per ton on tonnage in excess of the 16,667 gross tons mined in any month. Simultaneously, Hanna entered into an agreement with Collieries under which the latter designated Hanna as the sales agent for the coal. On January 2, 1959, Hanna and Collieries entered into an agreement designating Collieries as the operator of the mining activities on the property. The agreements between Hanna and Collieries were in substance counterparts of the agreements between Hanna and Biscontini. On February 25, 1959, Collieries' name was changed to Susquehanna Anthracite, Inc. (hereinafter referred to as Anthracite). On November 2, 1958, Glen Nan was incorporated and all of Biscontini's interest in the agreements with Hanna was orally assigned by Biscontini to Glen Nan, subject to all liabilities and obligations of Biscontini under the agreements. This assignment was reduced to writing on April 2, 1962. In July of 1959, it became apparent that Biscontini's successor, Glen Nan, did not have sufficient capital *80 to build a new breaker and that the Glen Lyon breaker was in need of repair. Also, the Operating Agreement was much more lucrative to Hanna than the benefits it would obtain under the Sales Agreement. Therefore, Hanna agreed to remodel the breaker in exchange for extensions of the various agreements previously entered into between the parties. Consequently, the General Agreement was amended to provide for delivery of the deed to the Newport Lands on July 1, 1964 [8] and the Operating Agreement was extended to July 1, 1964. [9]
On September 30, 1961, Susquehanna entered into an agreement with Hanna, whereby Susquehanna acquired substantially all of the assets and assumed the principal liabilities of the Anthracite Division of Hanna, which included the outstanding stock of Anthracite and the lease and other agreements between Anthracite (formerly Collieries) and Hanna. The purchase price was $1,550,000. In November of 1962, Glen Alden notified Hanna's successor, Susquehanna, that it was in default on *81 the mortgage and that the present balance of $869,604.20 was due. Susquehanna transferred funds from a bank in Philadelphia to the First National Bank of Wilkes-Barre, borrowed $250,000 from the latter bank, and tendered a check for $869,604.20 to Glen Alden. Glen Alden refused the check on the ground that other monies were owed to it and instituted foreclosure proceedings against the property. Eventually, Glen Alden accepted the aforementioned check in satisfaction of the balance owed on the mortgage. The mortgage on the Newport Lands was then assigned by Glen Alden to the First National Bank of Wilkes-Barre on November 30, 1962 and held by the bank in its name for the benefit of Susquehanna until satisfied in August 1970. Susquehanna never notified Glen Nan of these events prior to the deed to Glen Nan on January 1, 1965, and the mortgage then on record was not marked satisfied because Susquehanna wished to keep secret the extent of its liquid assets. In 1964, Susquehanna made a further payment of $47,500 to Glen Alden representing accrued interest on the $869,604.20. [10]
*82 On January 1, 1965, Anthracite and Susquehanna executed a deed of the Newport Lands to Glen Nan without payment of any further consideration by the latter. 928 The deed was expressly made subject to the Sales Agreement dated June 17, 1958 between Biscontini and Hanna. From and after July 1, 1958, and continuing until August 1970, Hanna and its successors in interest deducted and withheld the amounts otherwise due and owing by them to Biscontini and its successors as follows: (a) Sums totalling $1,225,000 were deducted and withheld at a rate of 20 cents for each gross ton mined and sold commercially from the Newport Lands, and (b) Amounts equal to all taxes on the Newport Lands were deducted and withheld in accordance with tax rates then in effect. During the period July 1, 1958 to August 17, 1970, sums totaling $1,225,000 were paid or applied in reduction of the mortgage on the Newport Lands. Hanna and its successors in interest regularly notified Biscontini and Glen Nan of payments on the mortgage as well as of payments of taxes on the Newport Lands. The books and records of Biscontini reflect the transactions dealing with the Newport Lands in the following manner: *83 (a) The acquisition of the Newport Lands was recorded by a debit to an account captioned "Coal Lands" in the amount of $1,600,000 and credits totalling $1,600,000 to accounts captioned "Cash" ($275,000), "Loan Payable - Susquehanna Collieries Division, The M. A. Hanna Company" ($100,000), and "Loan Payable on Purchase of Coal Lands" ($1,225,000). (b) Amounts deducted by Susequehanna (and its predecessors in interest) from amounts otherwise due and owing to Biscontini as set forth above were debited to the account captioned "Loan Payable on Purchase of Coal Lands." (c) A payment in the amount of $100,000 made by Glen Nan on October 10, 1961, to Hanna was debited to the account captioned "Loan Payable - Susquehanna Collieries Division, The M. A. Hanna Company," thereby closing out said account. (d) The amounts deducted by Susquehanna Coal Company (and its predecessors in interest) from amounts otherwise due and owing to Glen Nan Coal Co., Inc. (its predecessor and successor) for the payment of taxes were debited to an account captioned "Real Estate Taxes - Expense." The books and records of Hanna reflect the acquisition of the Newport Lands by a debit to an account captioned *84 "Depletable Property" in the amount of $1,600,000 and a credit to accounts captioned "Mortgage Payable" ($1,225,000) and "Accounts Payable - Suspense" ($375,000). The books and records of Anthracite (formerly Collieries) reflect the transactions dealing with the Newport Lands as follows: (a) The assignment of the Newport Lands from Hanna to Anthracite was recorded by a debit to an account captioned "Depletable Property Purchased - Coal Lands Assigned to Susquehanna Collieries Division Re Glen Alden Lands" in the amount of $1,600,000 and credits totaling $1,600,000 to accounts captioned "Mortgage Payable" ($1,225,000) and "Accounts Payable - Suspense" ($375,000). (b) Amounts deducted by Anthracite, from amounts otherwise due and payable to Glen Nan (and its predecessor) were debited to the account captioned "Mortgage Payable" and credited to the account captioned "Depletion Accrued Re Glen Alden Purchase." (c) The payment of Susquehanna (and its predecessors in interest) of all taxes on the Newport Lands to the appropriate authorities was recorded. When Susquehanna paid Glen Alden $869,604.20 in satisfaction of the latter's mortgage, it debited an account entitled "Mortgages *85 Payable" and credited cash. Prior to January 1, 1965, payments received from Glen Nan on account of the mortgage were recorded as royalty income by Susquehanna and an account representing Glen Nan's liability to Susquehanna on account of the mortgage was credited. After January 1, 1965, the characterization of these payments as royalty income was changed so that payments received on account thereof were debited to cash and credited to an account representing Glen Nan's liability to Susquehanna. In computing the limitation for percentage depletion based on gross income as provided under section 613 of the Internal Revenue Code of 1954, as amended, Susquehanna excluded from gross income, for all taxable years herein involved, amounts paid or credited to Glen Nan for coal mined from the Newport Lands. In its original tax returns for fiscal 1962 and 1963, Susquehanna claimed no depletion in respect of the Newport Lands. In amended returns for those years and in its return for fiscal 1964, it claimed depletion on the amounts derived from the sale 929 of coal from the Newport Lands after deduction of the amounts paid or credited to Glen Nan. By way of amended *86 petition herein, Susquehanna now claims depletion on the gross amount derived from the sale of such coal without reduction for amounts paid or credited to Glen Nan. For each taxable year, Glen Nan and its predecessor, Biscontini, reported as "income from coal sales from the Newport Land" the total amounts actually received by it from Susquehanna (and its predecessors in interest) during the year plus amounts deducted and withheld by them and took depletion on these amounts. Opinion At the outset, it will be useful to outline the nature of the dispute herein. Susquehanna argues that it, and not Glen Nan, had the requisite "economic interest" in the Newport Lands and that consequently it alone is entitled to the depletion deduction. Susquehanna makes the alternative argument that, in any event, it is entitled to a depletion deduction in respect of the amounts received from its disposition of such coal after deduction for amounts paid by it to Glen Nan. Glen Nan's primary position is that it, and not Susquehanna, had the requisite "economic interest" and that consequently it alone is entitled to the depletion deduction. Alternatively, Glen Nan asserts that, even if Susquehanna is *87 found to have such "economic interest," it (Glen Nan) also had a sufficient "economic interest" to justify the allowance of a deduction for depletion in respect of the amounts received by it from Susquehanna. Respondent's position is essentially that of a stakeholder. He asserts that either Susquehanna or Glen Nan is entitled to the depletion deduction in respect of the Newport Lands and on brief he has indicated that he believes that Glen Nan has the better claim. [11] He further insists that under no circumstances are Susquehanna and Glen Nan entitled to percentage depletion on the same income - a point of view which the parties do not dispute and with which we agree. Parsons v. Smith, 359 U.S. 215, 220 (1959). There is no dispute as to the amounts involved, nor as to the treatment of any of the items in question aside from the right to the percentage depletion deduction. Section 611(a) [12] provides for *88 a "reasonable allowance for depletion * * * according to the peculiar conditions in each case." As the Supreme Court pointed out in Commissioner v. Southwest Exploration Co., 350 U.S. 308, 312 (1956), the allowance "is designed to permit a recoupment of the owner's capital investment in the minerals, so that when the minerals are exhausted, the owner's capital is unimpaired." See also Parsons v. Smith, supra.
The necessary prerequisite to such an allowance is that the taxpayer must have an "economic interest" in the mineral in place. Palmer v. Bender, 287 U.S. 551 (1933); Charles P. Mullins, 48 T.C. 571, 579 (1967). The dual test of an "economic interest" has been delineated as follows by the Supreme Court in Commissioner v. Southwest Exploration Co., supra: In upholding the taxpayer's right to depletion on all such income, the Court [in Palmer v. Bender, supra] based its decision on the grounds that a taxpayer is entitled to depletion where he has: (1) "acquired, by investment, any *89 interest in the oil [coal] in place" and (2) secured by legal relationship "income derived from the extraction of the oil [coal] to which he must look for a return of his capital." See also Whitmer v. Commissioner, 443 F. 2d 170, 172 (C.A. 3, 1971), affirming a Memorandum Opinion of this Court; section 1.611-1(b)(1), Income Tax Regs.
The Supreme Court has also recognized that more than one taxpayer may have sufficient "economic interest" to justify an allowance for depletion to each, provided that the allowance is not duplicative in respect of the income from the property. See Parsons v. Smith, supra, 359 U.S. at 220. Whether a taxpayer has an "economic interest" is "ultimately a question of fact based on the totality of facts in each case." Leland Adkins, 51 T.C. 957, 965 (1969). The particular legal terminology used by the parties is not controlling; 930 moreover, technical title to the minerals in place is not important, nor is it a matter of consequence whether, under state law, the transaction is properly characterized as a sale, lease, or otherwise. Palmer v. Bender, supra; J. Bryant Kasey, 33 T.C. 656, 659 (1960). *90 It is against the background of the foregoing principles, which are easier to state than apply, that we turn to a consideration of the particular facts herein. We deal first with the status of Glen Nan (and its predecessor in interest, Biscontini). Susquehanna contends that, prior to January 1, 1965, Glen Nan was merely a mining contractor in its employ and that, consequently, Paragon Jewel Coal Company v. Commissioner, 380 U.S. 624 (1965), and Parsons v. Smith, supra, demand a decision herein that Glen Nan did not have an "economic interest" in the Newport Lands. Susquehanna points to the following facts as supportive of its position: the deeds from Glen Alden in the name of Hanna and, afterwards, from Hanna to Anthracite; the strong controls over the mining operation retained by Susquehanna in the Operating Agreement, particularly the power to terminate Glen Nan's mining activities and oust it under certain circumstances; the satisfaction by Susquehanna of the outstanding balance on the mortgage held by Glen Alden in 1962 without any contribution by Glen Nan and the payment of accrued interest in respect of the amount paid; the fact that the Newport Lands *91 were Susquehanna's only security in the event of Glen Nan's possible default on any of its obligations; the payment of a flat price per ton to Glen Nan and the consequent alleged subjection of Susquehanna to the risks and vagaries of the marketplace; Susquehanna's obligation to make payments on the mortgage and Glen Nan's obligation to convey the property to Susquehanna for $1.00 in the event of Glen Nan's default on the mortgage; and, finally, Susquehanna's exclusive right to sell all coal mined from the Newport Lands even after its conveyance to Glen Nan. Glen Nan's position, of course, is diametrically opposed to the one taken by Susquehanna. It contends that, after all the smoke is cleared, it should be treated as the owner of the Newport Lands and that Susquehanna (and its predecessors in interest) should be held to be merely processors with nothing more than an ecnomic advantage derived from the property. See Helvering v. Bankline Oil Co., 303 U.S. 362 (1938). It emphasizes the fact that Biscontini was the investigating party in the purchase and that all of the money for the down payment and subsequent payments of the purchase price came from either Biscontini *92 or Glen Nan rather than Susquehanna. We see no need to elaborate the fine distinctions that have been articulated in the decided cases, particularly with reference to the right to depletion on the part of socalled mining contractors. As we have previously pointed out (see page 22, supra), each case turns on its own facts. The down payment of $375,000, made to Glen Alden, was supplied by Biscontini, with the escrow agent directly responsible to Biscontini in respect of $275,000 thereof.[13] While, in form, Hanna undertook to make the mortgage payments to Glen Alden, intially directly to Glen Alden and later through Anthracite (by virtue of Anthracite's assumption of the mortgage and Hanna's obligation under the lease from Anthracite), both the General Agreement and the Operating Agreement imposed the obligation to supply the precise amount of funds required upon Biscontini and, later, Glen Nan. Moreover, by a contemporaneous agreement, Hanna obligated itself to transmit to Glen Alden the funds so paid to it by Biscontini. It is also significant that Biscontini was obligated to pay the taxes charged against the property. See Haddock Mining Company v. United States, 92 F. Supp. 106, 109 (D. Pa. 1950); *93 Eastern Coal Corporation v. Yoke, 67 F. Supp. 166, 175 (D.W. Va. 1946); see Lesta Ramey, 47 T.C. 363, 373 (1967), affd. 398 F. 2d 478 (C.A. 6, 1968). Finally, Biscontini and, later, Glen Nan were specifically obligated to accept transfer of title and formally assume the mortgage. [14] 931 We are unimpressed by the fact that Susquehanna prepaid the balance *94 due Glen Alden on the mortgage in 1962. The record herein is deafeningly silent with respect to the reasons which underlay the necessity for such prepayment. It would appear that Susquehanna had failed properly to account to Glen Alden for the required tonnage payments and that conceivably this failure to account extended to funds which it had received from Glen Nan and should properly have been paid over to Glen Alden. Insofar as the interest payment by Susquehanna to Glen Alden is concerned, it seems obvious that this represented no more than compensation for moneys not paid when due; the mortgage itself was a non-interest-bearing obligation. See footnote 10, supra. It seems to us that if such payments were to be considered as creating an "economic interest" in Susquehanna at the expense of Glen Nan, it was incumbent upon Susquehanna, at the very least, to furnish us with a forthright explanation of the surrounding circumstances. [15] Finally in this connection, we observe that Susquehanna kept the mortgage alive and clearly had the right to compel reimbursement from Glen Nan by way of the monthly payments and Glen Nan's assumption obligation. *95 Nor do we believe that the strict controls reserved to Hanna by the Operating Agreement operate to favor Susquehanna as against Glen Nan. As will subsequently appear, we have concluded that these controls merely served to protect Hanna's position as a financier-purchaser-coal processor, and not to confer upon it an "economic interest" in the coal in place. In any event, such controls, in our opinion, would not necessarily deprive Glen Nan of the "economic interest" which it had by virtue of the other elements involved. We do not attach any particular importance, in light of all the other factors involved herein, to the fact that the Operating Agreement specified that Biscontini was to be paid a fixed price per ton of coal, especially since there is evidence that such price was modified from time to time by agreement of the parties to reflect competitive conditions in the coal industry. See Paragon Jewel Coal Company v. Commissioner, supra, 380 U.S. at 635. We are unable to accept Susquehanna's assertion that the transactions between Hanna and Biscontini should be construed as a mere contract to sell the property in futuro with the $375,000 supplied by the latter *96 treated merely as an advance deposit on account of the purchase price, thus creating a "vertical slice" in respect of ownership, with Biscontini (and hence Glen Nan) entitled to depletion allowance only after the transfer of formal title. On the contrary, taking into account their obligations to make payments on account of the mortgage and taxes, together with the facts that Biscontini (and later Glen Nan) were in possession of the premises and had heavy responsibilities under the Operating Agreement, we construe the substance of the transactions as a sale in praesenti by Hanna to Biscontini with the payment of the balance of the purchase price deferred, with legal title being held by Hanna as security, and with, at most, a condition subsequent which would return substantive ownership to Hanna, and hence Susquehanna, upon default by Biscontini or Glen Nan. Cf. Jefferson Gas Coal Co., 16 B.T.A. 1135 (1929), affirmed as to this issue, 52 F. 2d 120 (C.A. 3, 1931). In analogous situations, delay in the passage of legal title has not precluded a holding that a closed transaction occurred for purposes of determining the time of taxability of the proceeds of sale *97 or that depreciation is allowable to the taxpayer even though he does not hold legal title. Compare, e.g., Helvering v. F. R. Lazarus & Co., 308 U.S. 252 (1939); Ted F. Merrill, 40 T.C. 66 (1963), affirmed per curiam, 336 F. 2d 771 (C.A. 9, 1964); North Carolina Lumber Co., 19 T.C. 587 (1952), reversed on another issue, 211 F. 2d 543 (C.A. 4, 1954); E. J. Murray, 21 T.C. 1049, 1062 (1954), affd. 232 F. 2d 742 (C.A. 9, 1956); Marion A. Blake, 8 T.C. 546 (1947). In short, we conclude that Glen Nan had an "economic interest" in the Newport Lands and is entitled to an allowance for depletion in respect thereto. In reaching this conclusion, we have not taken into account the indications in the record (which 932 are vague at best) that Biscontini may have invested substantial sums in conveyor belts and pumps. Such an investment is not sufficient to support a finding of an "economic interest." Parsons v. Smith, supra; William M. Legg, 39 T.C. 30, 38-39 (1962). We now turn to a consideration of whether Susquehanna had an "economic interest" so as to justify *98 an allowance for depletion. Much of what we have said in our discussion relating to the position of Glen Nan militates against any such allowance to Susquehanna. Thus, we have already noted that funds for the purchase price payable to Glen Alden emanated from Biscontini and, later, Glen Nan. As to $100,000 of the down payment, Hanna was no more than a creditor. With respect to the prepayment of the balance of the mortgage (see pp. 26-27, supra), in our opinion, Susquehanna had at best the same status. Cf. Bankers Mortgage Co., 1 T.C. 698 (1943), affirmed per curiam, 141 F. 2d 357 (C.A. 5, 1944). Of critical significance is the fact that the face amount of the mortgage was payable in all events. [16] Glen Nan was obligated to make the required mortgage payments and had assumed the liabilities of Biscontini (which included the latter's obligation in respect of the mortgage). The assumption agreements which Biscontini had executed could presumbly have been specifically enforced against Glen Nan. Indeed, Susquehanna did not have any personal liability on the mortgage. Hanna had transferred the property and the mortgage to its whollyowned subsidiary, Collieries *99 (later Anthracite), and Susquehanna had simply acquired the stock of that subsidiary from Hanna. To be sure, Hanna (and, through it, Susquehanna) had undertaken to make payments in amounts equal to those due Glen Alden under the mortgage and the taxes on the premises, by virtue of the lease between Hanna and Anthracite. But, looking at the totality of the Agreement, it is clear that Susquehanna ultimately had rights over against Glen Nan, i.e., it was no more than a guarantor of the mortgage. In this connection it should be noted that, as far as Glen Alden was concerned, it had no rights against Hanna or Susquehanna by virtue of Hanna's original assignment to Collieries (later Anthracite) in accordance with the "without recourse" clause in the mortgage. It could look only to Anthracite and Glen Nan by virtue of their assumption obligations and Anthracite had rights over and against Glen Nan via Susquehanna under the General Agreement and Operating Agreement. Thus, as we view the situation, legal title to the Newport Lands and Glen Nan's potential liability to reconvey remained in the Susquehanna complex merely as security for the fulfillment by Glen Nan of its personal liability to *100 pay off the mortgage, make the tax payments, and perform its obligations under the Operating Agreement. [17] Clearly the foregoing circumstances are insufficient to create an "economic interest" in Susquehanna. Cf. Anderson v. Helvering, 310 U.S. 404 (1940). See also Holbrook v. Commissioner, 450 F. 2d 134 (C.A. 5, 1971), reversing on other grounds 54 T.C. 1617 (1970), and cases cited therein. Concededly, if Glen Nan had defaulted on its obligations, Susquehanna could, and probably would, have taken over the operation of the Newport Lands and, in such a situation, might then have been able to claim such "economic interest." But the possibility of such "shifting use" in futuro does not support a present claim in this regard. Or, to put it another way, if, as Susquehanna asserts, there was a "vertical slice" in the ownership of those lands, Susquehanna, not Glen Nan, had the upper (or later) slice. *101 Nor do any of the other elements of Susequehanna's position justify the conclusion that it had an "economic interest" in the Newport Lands. Its role as the purchaser chaser processor, and seller of the coal production will not support a finding of such an interest, since it is clear that such role was not an essential part of the extraction process. Cf. Helvering v. Bankline Oil Co., supra; Utah Salt Co. v. Wise, 370 F. 2d 976 (C.A. 10, 1967); 933 CBN Corporation v. United States, 364 F. 2d 393 (Ct. Cl. 1966). Compare Food Machinery and Chemical Corp. v. United States, 366 F. 2d 1007 (Ct. Cl. 1966) and 348 F. 2d 921 (Ct. Cl. 1965). Similarly, Susquehanna's claims as to "vast" investments in the breaker installation (as to which the record, in any event, contains only the vaguest references) are beside the point. Usibelli v. Commissioner, 229 F. 2d 539 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court. We have no doubt that the financial, processing, and sales capabilities of Hannah, and, later, Susquehanna, were important in enabling Biscontini, and, through it, Glen Nan, to acquire and *102 successfully operate the Newport Lands. But economic power is not to be equated with "economic interest". Herein lies the fallacy of Susquehanna's position. We hold that Susquehanna did not have an "economic interest" in the Newport Lands coal and therefore is not entitled to any depletion allowance. In view of our conclusions, we need not consider the alternative arguments of Susquehanna and Glen Nan. Issue 2. Workmen's Compensation Payments Findings of Fact All of the facts revelant to this issue have been fully stipulated. On or about September 30, 1961, Susquehanna entered into an agreement with Gap whereby Gap was to operate one of Susquehanna's coal processing plants in Pennsylvania known as the Glen Burn Breaker. The agreement provided, in part, as follows: (4) Gap shall pay all costs of operations of every nature and description in connection with the securing and preparation of said coal, including but not confined to Workmen's Compensation Insurance and Occupational Disease Insurance. (5) Susquehanna agrees to Gapto Gap in full compensation for all charges, including costs of every description, excluding depreciation and depletion, the actual out-of-pocket *103 expenses paid by Gap in the performance of this obligation, plus two (2") cents a net ton for all coal No. 3 Buck and above which shall be prepared and sold from the breaker. It is distinctly understood that Susquehanna does not guarantee any debts or obligations of Gap and does not make itself responsible to any third person or persons. (6) Settlement for all costs shall be made on the 15th day of each month for the preceding month except Vacation Pay which shall be advanced to Gap when due to be paid out by Susquehanna approximately June 25th to 30th each year, upon statement rendered and certified by Gap to Susquehanna at the office of Susquehanna this statement, unless excepted to by Susquehanna within ten (10) days, shall be final, binding and conclusive on both parties and subject to no additions, subtractions, corrections or retroactive charges or credits in favor of or against either party hereto. * * * (10) Gap does hereby assume and agree to assume, so far as Susquehanna is concerned, the liability for all injury or damage done to or suffered by any persons or property in connection with the possession or operation of the property by Gap under this Agreement and does *104 hereby further agree to hold Susquehanna harmless and indemnify it against any claims in connection therewith. (11) This Agreement may be terminated on thirty (30) days written notice by either party to the other, sent by Certified Mail to the appropriate office. * * * The amount of liability in each accident or disability case arising within the framework of Pennsylvania's workmen's compensation laws is determined by the State Workmen's Compensation Board and becomes a definite liability at that time. Payments are made monthly over a period of years. Prior to Gap's taxable year ended September 30, 1964, Gap deducted amounts for workmen's compensation claims through the payroll account when actually paid and Susquehanna reimbursed Gap for these payments on the 15th day of the following month. On February 26, 1964, Gap suffered a mining mishap in which three of its employees were killed. As of September 30, 1964, Gap owed approximately $40,000 for this accident on account of workmen's compensations claims, none of which was due to be paid until after that date. The total workmen's compensation claims accrued for fiscal year 1964 were as follows: Claims from
Amount
1961
$ 486
1962
1,823
1963
14,533
1964 45,234
$62,076
*105 934 For the month of September of 1964, Gap billed Susquehanna $62,076.48 as "Workmen's Compensation Claims Determined"; Susquehanna deducted this amount on its fiscal 1964 return, in which it showed a net operating loss of $305,613.99. Gap accrued the charge to Susquehanna as income and the liability in an equal amount as an expense on its own fiscal 1964 return, on which it claimed aggregate deductions of $758,244.66. Prior to fiscal 1964, Gap's workmen's compensation claims were relatively insignificant and were deducted by Gap and Susquehanna on the cash basis of accounting. With this exception, both Susquehanna and Gap filed their Federal income tax returns using the accrual method of accounting. In its notice of deficiency to Susquehanna, respondent stated: Workmen's compensation-Gap Anthracite Co. deducted in the amount of $62,076.48, for the taxable year ended September 30, 1964, is disallowed as permission of the commissioner was never obtained in changing the method of accounting. The notice of deficiency sent to Gap stated, in relevant part, as follows: It is determined that since the cash method of accounting was adopted by you with respect to workmen's *106 compensation insurance claims, the deductions allowable for such claims are limited to the amounts actually paid. Opinion Section 446(e) provides, in effect, that a taxpayer cannot change his method of accounting for reporting taxable income without the prior consent of the Commissioner. Section 1.446-1(e)(2)(ii)(a), Income Tax Regs., defines the term "method of accounting" as not only the overall method used by the taxpayer but also that used for the treatment of any material item. According to respondent's regulations, a material item is "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." [Emphasis added.] Section 1.446-1(e)(2)(ii)(a), Income Tax Regs. A change in the underlying facts of a situation will not be considered a change in accounting method. Section 1.446-1(e)(2)(ii)(b), Income Tax Regs.; Decision, Inc., 47 T.C. 58 (1966). The resolution of the issue before us has two components. First, petitioners contend that the change by Gap in its billing method to include liabilty for accrued but unpaid workmen's compensation, and Susquehanna's action in respect thereto, constituted a modification of *107 the 1961 agreement and therefore a change in the underlying facts rather than a change in accounting method within the meaning of section 1.446-1(e)(2) (ii)(b) of respondent's regulations and our holding in Decision, Inc., supra. Second, they contend that, even if a change of accounting method was involved, it did not relate to a material item. Petitioners concede that, if we find that a change of accounting method as to a material item was involved, they did not obtain the prior consent of the Commissioner under section 446(e), which they were required to do. Respondent urges us to reject both contentions of petitioners. We agree with respondent. The 1961 agreement between Susquehanna and Gap clearly provided that the former was to pay the latter for its "out-of-pocket expenses." Quite clearly, therefore, Gap was not entitled to reimbursement and no amount was due and payable by Susquehanna until Gap had actually made an expenditure. The only exception was in respect of vacation pay, which was to be advanced by Susquehanna "when due." The record herein merely shows that (a) Gap unilaterally decided to change its billing procedure and (b) Susquehanna took a deduction *108 for the amount billed. We have been furnished with no evidence that Susquehanna agreed to the change in Gap's billing procedure either by notifying Gap of its acquiescence or by payment within the time contemplated by the agreement. The only thing we know is that Susquehanna took a deduction on its tax return. For aught that appears, Susquehanna still did not consider itself liable for the payment until Gap actually made an expenditure on a claim. We are unable to conclude, therefore, that there was such mutuality of assent to a changed procedure as to constitute a change in business policy rather than a change of accounting method. See Decision, Inc., supra, 47 T.C. at 64. All of the Pennsylvania cases relied upon by petitioners involved a clear assent by the party to be bound, which either was disclosed directly to the other party or arose from a continuous course of action amounting to a waiver. We are reinforced in our analysis by the contrasting care which was taken by Gap 935 and Susquehanna to establish an accrual basis for reimbursement in the case of vacation pay. We also note that, absent any other explanation, the only reason for the change appears to *109 have been to enable Susquehanna substantially to increase its net operting loss; as far as Gap was concerned, the transaction produced a "wash," whichever method was utilized. See Decision, Inc., supra, 47 T.C. at 64; E. Morris Cox, 43 T.C. 448, 457, n. 3 (1965). In view of the foregoing, we hold that a change of accounting method occurred. [18]
We turn now to the question whether the liability for workmen's compensation claims constituted a material item within the meaning of respondent's regulations. Section 1.446-1(e)(2)(ii)(a), Income Tax Regs., was adopted in its present form in November of 1970, although it applies to all taxable years beginning after December 31, 1953. T.D. 7073, 1970-2 C.B. 98. Prior to this time, respondent's regulations did not contain a precise definition of the term "material item, *110 " which term appears in the Congressional reports accompanying the passage of section 446(e) in 1954. See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 300 (1954); H. Rept. No. 1337, 83d Cong., 2d Sess., p. A158 (1954). See also Dorr-Oliver, Inc., 40 T.C. 50, 53-54 (1963). We need not now decide whether respondent's regulations encompassing "any item" should be applied under all circumstances. The amount involved, i.e., $62,076.48, is certainly substantial in absolute terms. Moreover, it is substantial insofar as Susquehanna is concerned in that it represents over 20 percent of its claimed net operating loss for the taxable year in question, or, to put it another way, increases that loss by over 25 percent. With respect to Gap, it represents more than 8 percent of its claimed deductions for such taxable year. Under these circumstances, we hold that the item was "material." Cf. Hackensack Water Co. v. Commissioner, 352 F. 2d 807, 810 (Ct. Cl. 1965); Broida, Stone & Thomas, Inc. v. United States, 204 F. Supp. 841 (D.W. Va. 1962), affirmed per curiam, 309 F. 2d 486 (C.A. 4, 1962); Dorr-Oliver, Inc., supra, 40 T.C. at 55. *111 See section 1.446-1(e) (2)(iii), Example (2). Similarly, under such circumstances, we consider the fact that the amounts involved in such item in past years were small an irrelevant consideration. One final word. Respondent has conceded that Gap should not be required to accrue the $62,076.48 in income if Susquehanna is not entitled to a deduction therefor. Our reasoning accords with this concession and the amount therefor should be eliminated from Gap's gross income. To reflect our conclusions herein as well as the various concessions of the parties on other issues, Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Grant Anthracite Co., Docket No. 727-68; Glen Nan Coal Co., Docket No. 5032-68; Susquehanna Coal Company, Docket No. 4407-69.↩
2. Although all issues in Docket No. 727-68 have been resolved, the parties have asked that decision not be entered therein until decision is rendered in Docket No. 4407-69; we assent to this request.↩
3. Pursuant to a plan of liquidation adopted July 3, 1968, Glen Nan Coal Co., Inc. discontinued doing business and distributed all of its properties and assets to its sole shareholder, Glen Nan Coal Co., a partnership. Without objection on the part of respondent, Glen Nan Coal Co. has been substituted as petitioner in Docket No. 5032-68. Since July 8, 1968, the partnership has conducted the business previously carried on by the corporation from offices located in Wilkes-Barre, Pennsylvania.↩
4. This figure was arrived at by multiplying 20 cents times the estimated 8,000,000 tons of coal believed to be present on the Newport Lands. ↩
5. Such a provision was included in the deed executed by Anthracite and Susquehanna in favor of Glen Nan, dated January 1, 1965.↩
6. The Sales Agreement itself contained no effective date. However, it appears that it was not to take effect until Hanna delivered the deed to Biscontini; none of the parties argues otherwise.↩
7. Although Biscontini and Hanna extended the date of payment to July 1, 1964, Glen Nan, Biscontini's successor-in-interest, paid the note off on October 10, 1961; interest was waived.↩
8. This date was later extended to December 31, 1964 by an agreement dated April 1, 1964. ↩
9. By agreement dated April 1, 1964, the agreement was extended to December 31, 1964.↩
10. The record is silent as to how the amount of interest was determined. In view of the fact that the mortgage itself was non-interest-bearing, it presumably represented compensation to Glen Alden for not having received the mortgage principal payments on the due dates.↩
11. Respondent also agrees that if Glen Nan is not entitled to any deduction for depletion, it is entitled to deduct, as a business expense, the 20-cents-per-ton payments made to Susquehanna in amounts as to which respondent and Glen Nan are in agreement.↩
12. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.↩
13. To be sure, $100,000 of the down payment was obtained from Hanna by way of a loan, but the latter received an interest-bearing note therefor. In this connection, we note that Susquehanna's assertion that the rate of interest was substantially below the going rate of interest in the marketplace is utterly without foundation in the record and, in any event, would have little, if any, bearing on the issue involved herein. We also note that the interest on this indebtedness was waived at the time the principal was paid, for reasons unexplained in the record. ↩
14. Indeed, the separate agreement of assumption, contemporaneously executed on June 17, 1958, appears to have overtones of in praesenti effect, since Biscontini had already agreed to assume the mortgage in the General Agreement.↩
15. Susquehanna also asserts that a substantial portion of the purchase price paid by it to Hanna for the latter's Anthracite Division represented payment for the Newport Lands. The record is devoid of any probative evidence on this score; even the then balance of the Glen Alden mortgage in respect of which only Anthracite was obligated and which presumably was taken into account in determining the purchase price paid by Susquehanna is not revealed.↩
16. The mortgage called for minimum payments of $40,000 annually plus amounts related to coal production. Concededly, in the absence of such production, the period of the payout would have been over 30 years, but this cannot obscure the fact that the principal sum was ultimately payable. ↩
17. It should be noted that the purchase price of the Newport Lands was geared directly to the estimated coal deposits. See footnote 4, supra. Consequently, the obligation of Glen Nan to reconvey for $1.00 had no independent significance. The coal was to produce the funds to pay the purchase price, Glen Nan had the liability to make the mortgage payments, and it looked to its mining of the coal to supply those funds.↩
18. We see no purpose to be served in discussing respondent's argument that Susquehanna was, in any event, not liable to reimburse Gap in respect of workmen's compensation claims by virtue of paragraph (10) of the agreement. Consideration of such argument would involve problems comparable to those involved in squaring the circle.↩